ACCEPTED
03-15-00025-CV
7943312
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/23/2015 10:21:08 AM
JEFFREY D. KYLE
CLERK

No. 03-15-00025-CV

_____

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS
AUSTIN, TEXAS

_____

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
11/23/2015 10:21:08 AM
JEFFREY D. KYLE
Clerk

APPELLANTS, LAKEWAY REGIONAL MEDICAL CENTER, LLC AND
SURGICAL DEVELOPMENT PARTNERS, LLC// CROSS-APPELLANT,
LAKE TRAVIS TRANSITIONAL LTCH, LLC N/K/A LAKE TRAVIS
SPECIALTY HOSPITAL, LLC

v.

APPELLEES, LAKE TRAVIS TRANSITIONAL LTCH, LLC N/K/A LAKE
TRAVIS SPECIALTY HOSPITAL, LLC// CROSS-APPELLEES, LAKEWAY
REGIONAL MEDICAL CENTER, LLC, SURGICAL DEVELOPMENT
PARTNERS, LLC, BRENNAN, MANNA, & DIAMOND, LLC
AND FRANK T. SOSSI

_____

BRIEF OF APPELLEE
LAKE TRAVIS TRANSITIONAL LTCH, LLC N/K/A
LAKE TRAVIS SPECIALTY HOSPITAL, LLC ("LTT")

_____

Jane M.N. Webre
S. Abraham Kuczaj, III
Robyn B. Hargrove
**SCOTT DOUGLASS
    & MCCONNICO LLP**
303 Colorado Street, 24th Floor
Austin, TX  78701
(512) 495-6300
(512) 495-6399 Fax

COUNSEL FOR LTT

**ORAL ARGUMENT REQUESTED**

1250216

# TABLE OF CONTENTS

INDEX OF AUTHORITIES.................................................................................v

STATEMENT OF THE CASE.............................................................................x

STATEMENT OF JURISDICTION....................................................................x

RECORD........................................................................................................ xi

APPENDIX .................................................................................................... xi

ISSUES ......................................................................................................... xii

OVERVIEW ....................................................................................................1

STATEMENT OF FACTS ...............................................................................1

    A.    Defendants seek to acquire LTT's facility, which was designed with the flexibility to operate as a long-term care hospital or an acute-care hospital....................................................................................1

    B.    LTT shares confidential information with Defendants pursuant to the LOI. ...................................................................................................3

    C.    Defendants manipulate the LOI diligence process to game the HUD mortgage guaranty process........................................................5

    D.    Defendants use LTT's confidential information to secure the HUD guaranty. ..............................................................................................8

SUMMARY OF ARGUMENT ........................................................................10

ARGUMENT ...................................................................................................11

    A.    Ample evidence supports the jury's causation finding. ......................11

        1.    The equal inference rule applies only when multiple reasonable inferences are equally probable. ............................12

        2.    There are no equal inferences from the evidence; the only reasonable inference is that HUD relied on Defendants...........14

1250216

B.      The damages findings are supported by sufficient evidence. .............17

        1.      LTT was a proper assignee of Berry and McDonald.................17

        2.      Ample evidence supports the jury's award of $7.9 million
                in lost fair market value of LTT.................................20

                a.      *Phillips v. Carlton* confirms that fair market value
                        can be based on an agreed purchase price. .....................20

                b.      The evidence and Defendants' judicial admissions
                        establish that $7.9 million was the fair market
                        value for LTT.................................................22

                c.      $7.9 million is within the range of evidence of
                        LTT's lost fair market value, particularly in light
                        of the mitigation instruction. ...........................24

                d.      Relying on the agreed purchase price does not
                        conflict with the summary judgment ruling
                        regarding section 2..........................................25

                e.      The measure of damages does not impermissibly
                        "mix and match" methodologies to calculate fair
                        market value.................................................27

        3.      Berry's testimony was not conclusory or speculative. .............28

        4.      The loss in fair market value was foreseeable. .........................32

        5.      Ample evidence supports the jury's award of $790,000 in
                lost fair market value for the confidential information.............36

        6.      In the alternative, remand is proper because there is
                evidence of some damages.........................................38

C.      SDP's argument that it is not a party to the LOI fails again. ...............38

        1.      SDP waived any complaint that it was not a party to the
                LOI. .........................................................................38

iii

1250216

2.     An agent may be personally liable on contracts made for the benefit of his principal—even where the principal is disclosed. .......................................................................39

3.     SDP identified itself as a party to the LOI and obligated itself under the LOI and is consequently individually liable for breach of the LOI. .....................................................40

4.     The LOI is not ambiguous regarding SDP's party status, and no jury question was proper. .............................................42

5.     There is ample evidence that SDP breached the LOI. ..............43

D.     The trial court properly charged the jury on breach of contract and damages. .......................................................................44

1.     Background on broad-form submission and *Casteel*................45

2.     *Casteel* granulation is not required unless the alleged invalid theory was presented to the jury at trial........................47

a.     Factual allegations underlying breach of contract do not need to be granulated...........................................48

b.     *Casteel* does not apply if the alleged invalid theory was not before the jury at trial.......................................52

c.     LTT never advocated at trial that Defendants breached section 2 of the LOI........................................55

3.     Defendants' proposed instruction would not have cured any alleged error and was otherwise improper. .......................56

E.     The fee award was proper. ...............................................................58

CONCLUSION AND PRAYER .............................................................................58

CERTIFICATE OF SERVICE ...............................................................................60

CERTIFICATE OF COMPLIANCE......................................................................60

1250216

**Cases**

*Alonysius v. Kislingbury*,
No. 01-13-00147-CV, 2014 WL 4088145 (Tex. App.—Houston
[1st Dist.] Aug. 19, 2014, no pet.) ........................................................ 19, 38

*American Nat'l Bank of Houston v. Am. Loan & Mortg. Co.*,
228 S.W. 169 (Tex. Comm'n App. 1921, judgm't adopted)........................39

*Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc.*,
348 S.W.3d 894 (2011)................................................................ 32, 33, 34

*Bed, Bath & Beyond, Inc. v. Urista*,
211 S.W.3d 753 (Tex. 2006) .............................................................. passim

*Benge v. Williams*,
__S.W.3d__, No. 01-12-00578-cv, 2014 WL 6462352
(Tex. App.—Houston [1st Dist.] Nov. 18, 2014, n.p.h.)................... 52, 53, 56

*Benton v. State,*
336 S.W.3d 355 (Tex. App.—Texarkana 2011, pet. ref'd)..........................23

*Bohnsack v. Varco, L.P.*,
668 F.3d 262 (5th Cir. 2012) .............................................................. 26, 27

*Burbage v. Burbage*,
447 S.W.3d 249 (Tex. 2014) ....................................................................13

*City of Dallas v. Redbird Development Corp.*,
143 S.W.3d 375 (Tex. App.—Dallas 2004, no pet.) ........................ 29, 30, 32

*Clear Lake City Water Authority v. Kirby Lake Dev., Ltd.*,
123 S.W.3d 735 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) .......54

*Coastal Transp. Co., Inc. v. Crown Central Petroleum*,
136 S.W.3d 227 (Tex. 2004) ....................................................................29

*Columbia Medical Center of Las Colinas v. Bush*,
122 S.W.3d 835 (Tex. App.—Fort Worth 2003, pet. denied)......................50

1250216

*Columbia Rio Grande Healthcare, L.P. v. Hawley*,
  284 S.W.3d 851 (Tex. 2009) ................................................................. 47, 52

*Crown Life Ins. Co. v. Casteel*,
  22 S.W.3d 378 (Tex. 2000) ................................................................. passim

*Dillard v. Texas Elec. Co-Op*,
  157 S.W.3d 429 (Tex. 2005) .......................................................................46

*Duke Energy Field Services, L.P. v Meyer*,
  190 S.W.3d 149 (Tex. App.—Amarillo 2005, pet. denied) .........................29

*Empire Life Ins. Co. of America v. Valdak Corp.*,
  468 F.2d 330 (5th Cir. 1972) ......................................................................19

*Faour v. Faour*,
  789 S.W.2d 620 (Tex. App.—Texarkana 1990, pet. denied).......................18

*Formosa Plastics Corp., USA v. Kajima Int'l, Inc.*,
  216 S.W.3d 436 (Tex. App.—Corpus Christi—Edinburg 2006,
  pet. granted, judg't vacated by agrt.)............................................................50

*GJP, Inc. v. Ghosh*,
  251 S.W.3d 854 (Tex. App.—Austin 2008, no pet.)....................................56

*Gupta v. Eastern Idaho Tumor Institute, Inc.*,
  140 S.W.3d 747 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) .......57

*Haase v. Glazner*,
  62 S.W.3d 75 (Tex. 2001) ..........................................................................26

*Hancock v. Variyam*,
  400 S.W.3d 59 (Tex. 2013) .........................................................................13

*Harris County v. Smith*,
  96 S.W.3d 230 (Tex. 2002) ................................................................. 46, 47

*Holt Atherton Industries, Inc. v. Heine*,
  835 S.W.2d 80 (Tex. 1992) .........................................................................28

*Horizon/CMS Healthcare Corp. v. Auld*,
  34 S.W.3d 887 (Tex. 2000) .........................................................................23

vi

1250216

*Hughes v. Pearcy*,
No. 03-10-00319, 2014 WL 7014353 (Tex. App.—Austin 2014,
pet. denied) ......................................................................................23

*Inimitable Group, L.P. v. Westwood Group Dev. II, Ltd.*,
264 S.W.3d 892 (Tex. App.—Fort Worth 2008, no pet.) ...........................57

*Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc.*,
334 F.3d 423 (5th Cir. 2003) ............................................... 39, 42

*Jelinek v. Casas*,
326 S.W.3d 526 (Tex. 2010) ......................................................13

*Louisiana-Pacific Co. v. Knighten*,
976 S.W.2d 674 (Tex. 1988) ......................................................56

*Lozano v. Lozano*,
52 S.W.3d 141 (Tex. 2001) ................................................ 12, 13

*Marathon Corp. v. Pitzner*,
108 S.W.3d 724 (Tex. 2003) ......................................................13

*McFarland v. Boisseau*,
365 S.W.3d 449 (Tex. App.—Houston [1st Dist.] 2011, no pet.)................54

*McMillin v. State Farm Lloyds*,
180 S.W.3d 183 (Tex. App.—Austin 2005, pet. denied)....................... 24, 37

*Mediacomp, Inc. v. Capital Cities Comm'n, Inc.*,
698 S.W.2d 207 (Tex. App.—Houston [1st Dist.] 1985, no writ) ...............42

*Medina v. Hart*,
240 S.W.3d 16 (Tex. App.—Corpus Christi 2007, pet. denied) ..................23

*Memon v. Shaikh*,
401 S.W.3d 407 (Tex. App.—Houston [14th Dist.] 2013, no pet.) . 48, 49, 54

*Osterberg v. Peca*,
12 S.W.3d 31 (Tex. 2000) ......................................................38

vii

*Phillips v. Carlton Energy Group, LLC.*
  ___ S.W.3d ___, No. 12-0255, 2015 WL 2148951
  (Tex. May 8, 2015) ................................................................ passim

*Pleasant v. Bradford,*
  260 S.W.3d 546 (Tex. App.—Austin 2008, pet. denied) .......... 22, 24, 27, 28

*Powell Elec. Sys., Inc. v. Hewlett Packard Co.,*
  356 S.W.3d 113 (Tex. App.—Houston [1st Dist.] 2011,
  no pet.) ............................................................... 47, 50, 51, 52

*Reid Road Mun. Utility Dist. No. 2 v. Speedy Stop Food Stores, Ltd.,*
  337 S.W.3d 846 (Tex. 2011) ....................................................29

*Rojas v. Duarte,*
  393 S.W.3d 837 (Tex. App.—El Paso 2012, pet. denied) ............................38

*Romero v. KPH Consol., Inc.,*
  166 S.W.3d 212 (Tex. 2005) ....................................................53

*Rough Creek Lodge Operating, L.P. v. Double K Homes, Inc.,*
  278 S.W.3d 501 (Tex. App.—Eastland 2009, no pet.) .................... 47, 50, 51

*Sand Point Ranch, Ltd. v. Smith,*
  363 S.W.3d 268 (Tex. App.—Corpus Christi 2012, no pet.) .......................54

*Shelby Distributions, Inc. v. Reta,*
  441 S.W.3d 715 (Tex. App.—El Paso 2014, no pet.) .................................49

*Springs Window Fashions Div., Inc. v. Blind Maker, Inc.,*
  184 S.W.3d 840 (Tex. App.—Austin 2006, pet. granted,
  judgm't vacated w.r.m.) ................................................................28

*Stinnett v. Paramount-Famous Lasky Corp.,*
  37 S.W.2d 145 (Tex. Comm'n. App. 1931, holding approved) ............. 18, 19

*Stuart v. Bayless,*
  964 S.W.2d 920 (Tex. 1998) (per curiam) ...................................32

*Sunbridge Healthcare Corp. v. Penny,*
  160 S.W.3d 230 (Tex. App.—Texarkana 2005, no pet.) ...........................50

viii

*Tex. Dep't of Human Servs. v. E.B.*,
    802 S.W.2d 647 (Tex. 1990) ..........................................................................45

*Tex. Dept. of Assistive & Rehabilitative Servs. v. Abraham*,
    No. 03-05-00003-CV, 2006 WL 191940, n.8 (Tex. App.—Austin
    Jan. 27, 2006, no pet.) (mem. op.) ...................................... 45, 53, 56

*Texas Comm'n on Human Rights v. Morrison*,
    381 S.W.3d 533 (Tex. 2012) (per curiam) ............................. 49, 54

*Thota v. Young,*
    366 S.W.3d 678 (Tex. 2012) .................................... 46, 47, 49, 54

*Traxler v. Entergy Gulf States, Inc.*,
    376 S.W.3d 742 (Tex. 2012) ........................................................44

*United Pacific Railroad Co. v. Williams*,
    85 S.W.3d 162 (Tex. 2002) ..........................................................56

*USAA Cty. Mut. Ins. Co. v. Cook*,
    241 S.W.3d 93 (Tex. App.—Houston [1st Dist.] 2007, no pet.)...................13

*Wingate v. Hajdik*,
    795 S.W.2d 717 (Tex. 1990) ............................................ 17, 18

## Statutes

12 U.S.C. § 1715z-7(a) ..........................................................................5, 14

24 C.F.R. § 242.16 ..........................................................................5

Tex. Gov't Code § 22.220 ..........................................................................x

Tex. R. Civ. P. 277..........................................................................45

## Other Authorities

*Restatement (Second) of Contracts* § 351 (1981) ...................................32

ix

## STATEMENT OF THE CASE

*Nature of the Case:* This breach of contract case involves two hospital projects in Lakeway, Texas. Lake Travis Transitional LTCH, LLC ("LTT") sued Lakeway Regional Medical Center, LLC ("LRMC") and Surgical Development Partners, LLC ("SDP") (together, "Defendants"), as well as certain Lawyer Defendants involved in the transaction, for improperly taking LTT's confidential information obtained pursuant to a binding Letter of Intent (the "LOI") and using it to secure a lucrative government-backed mortgage that allowed them to build a competing hospital. The LOI had contemplated that LTT and Defendants would work together on the LTT project, and did not permit the use of LTT's information for any other purpose. The LOI is attached at App.1.

*Trial Court:* 343rd District Court of Travis County, Texas. Hon. Steven Yelenosky rendered a pretrial partial summary judgment. Hon. Lora Livingston presided over the subsequent jury trial and rendered the final judgment.

*Course of Proceedings:* Judge Yelenosky rendered partial summary judgment as to LTT's claim for misappropriation of trade secrets and its claim that Defendants breached section 2 of the LOI. The summary judgment orders are the subject of LTT's Brief of Cross-Appellant.

LTT's remaining claims were tried to a jury, which found that Defendants breached the LOI. App.4. Judge Livingston rendered judgment on the jury's verdict against Defendants for $7.9 million in actual damages, together with $2 million in stipulated attorneys' fees, pre- and post- judgment interest, and costs of court. App.3.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal from a final judgment of a district court pursuant to Texas Government Code § 22.220.

x

The record on appeal includes a 3-volume Clerk's Record and four 1-volume supplemental Clerk's Records, only one of which is labeled "supplemental." Citations to the 3-volume Clerk's Record will be to volume and page: ___CR___. Citations to the one-volume Clerk's Records will be to date and page: 5/21CR___, 6/18CR___, 7/17CR___, or 7/21CR___.

There is a 20-volume Reporter's Record, a 1-volume supplemental Reporter's Record, and a 1-volume Reporter's Record that is not labeled "supplemental." Volume 1 of the 20-volume Reporter's Record is a Master Index. Volumes 2 and 3 are pretrial hearings held on 2/4/14 and 7/2/14, respectively. Volumes 4 through 15 include the jury trial in August 2014. Volumes 16 and 17 include the exhibits from the 2/4/14 pretrial hearing. Volumes 18 through 20 include the trial exhibits. The Supplemental Reporter's Record includes additional trial exhibits; it is duplicative of some of the exhibits in Volume 20. The 1-volume Reporter's Record (filed 1/22/15) is the same 7/2/14 hearing transcript as Volume 3 of the 20-volume Reporter's Record.

Citations to the Reporter's Record will be to volume and page number: ___RR___. Citations to trial exhibits will be to party and exhibit number: PX___, DX___. Citations to video deposition testimony will be to the Court Exhibit number (CE___), followed by the hour, minute, and second.

## APPENDIX

References to items included in the Appendix will be to App. ____.

App. 1  Letter of Intent  (PX2)

App. 2  Confidentiality Agreement (PX4)

App. 3  Judgment (6/18CR3-5)

App. 4  Charge of the Court (3CR12997-13009)

App. 5  May 10 e-mail (PX180)

App. 6  June 21 letter (PX136)

1250216

## ISSUES

1.    The evidence showed that Defendants communicated with HUD extensively to secure and protect their government-backed mortgage guaranty, that Defendants used confidential information from LTT received pursuant to the LOI to answer HUD's questions about whether LTT was a potential competitor hospital, and HUD parroted Defendants' arguments in defending its failure to consider LTT when analyzing whether Lakeway was underserved.  Is that evidence—and the reasonable inferences that flow from it—sufficient to support the jury's determinations regarding causation?

2.    Can LTT, as assignee of its principals, sue for damages under the LOI?

3.    Is the jury's determination that LTT's loss of fair market value was $7.9 million supported by sufficient evidence, given: (1) direct evidence and counsel's judicial admission in open court that $7.9 million was the fair market value a willing buyer and a willing seller had agreed for LTT before breach; and (2) evidence that the loss of fair market value was $13.8 million, together with evidence that LTT could have recouped about half of that in mitigation by selling the land and certain equipment?

4.    Was Berry's testimony regarding LTT's fair market value conclusory and speculative?  Did Defendants waive this issue by failing to object to the testimony at trial?

5.    Were LTT's damages foreseeable?  Could Defendants have anticipated that LTT would suffer a loss in market value if they: (1) persuaded LTT to stop construction of its hospital under the LOI, even though LTT was two years ahead of Defendants' planned hospital;  then (2) used LTT's confidential information to secure a lucrative mortgage guaranty that gave Defendants a significant competitive advantage in the area?

6.    Is the jury's finding of $790,000 for loss of value of LTT's confidential information supported by sufficient evidence?

7.    Is SDP a party to the LOI?  Did it waive any charge error by failing to object that the charge defined LOI as being the agreement "between SDP and LTT?"  Is there sufficient evidence that SDP breached the LOI?

1250216

8.    The charge properly included broad-form questions for breach of contract liability and damages.   Defendants argue that the questions impermissibly mixed valid and invalid theories, claiming that the jury could have based its "yes" answer on a breach of section 2 of the LOI, and section 2 is not enforceable.   At trial, LTT presented no evidence or argument that Defendants had breached section 2; there is no possibility that the jury could have based its answer on section 2.   Does *Casteel* and its presumed harm rule apply under these circumstances?

1250216

At issue is a breach of the LOI, and it is critical to identify the relevant breach. LTT did not contend at trial that Defendants breached the LOI by failing to consummate the transaction contemplated by the LOI. Instead, the gravamen of LTT's claim for breach is deceit. Defendants breached the LOI by taking LTT's confidential information—shared to facilitate Defendants' acquisition of LTT's facility—and instead using that information to secure a $166 million HUD-backed mortgage to build a competing hospital for their own economic benefit. The misuse of LTT's confidential information in violation of the LOI is the basis of LTT's breach of contract claim, and there is substantial evidence that Defendants did just that.

## STATEMENT OF FACTS

LTT also relies on the statement of facts in its opening brief.

A. <u>Defendants seek to acquire LTT's facility, which was designed with the flexibility to operate as a long-term care hospital or an acute-care hospital.</u>

This suit involves a hospital LTT developed in the Lakeway area. LTT's CEO Robert Berry explained that the hospital was designed to open as a long-term acute care hospital ("LTCH") with the ability to convert into a general acute-care hospital ("ACH"). 6RR79; 6RR96; PX25. LTT secured C1 zoning from the City of Lakeway, which was appropriate since there was no specific category for hospitals, and Lakeway approved LTT's general development plan. 6RR101-02;

1

DX158.[1]  LTT hired architects and contractors to "make an initial assessment of the viability of that site."  6RR104.  LTT secured agreements from them to keep all hospital information confidential.  6RR108.

Healthcare REIT financed LTT's hospital.  6RR113.  As with the architects and contractors, LTT required confidentiality agreements from its lenders before sharing information about the project.  *See* PX392; PX36; 6RR114-15.  Under their lease, Healthcare REIT would finance construction, HCN would be the landlord, and LTT would be the tenant.  PX338; 6RR122-124 (explaining financial structure of lease).  The lease contemplated $21.6 million in construction financing.  6RR124-25.

Construction began in 2008, and by spring 2009 was near completion.  LRMC, a larger hospital just a half-mile away, was just beginning development.  SDP's CEO Eddie Alexander testified that LRMC was planned as a physician-owned hospital, but regulatory changes would soon ban that.  11RR8-9.  The plan was for LRMC "to avoid the ban on physician-ownership by opening LTT as its initial campus."  11RR10.  Defendants contacted LTT because they "were interested in acquiring our lease."  6RR89.

Before providing information to Defendants, LTT took steps to protect confidentiality.  On May 11, 2009, SDP and LTT executed a Confidentiality

---

[1] Lakeway's approval for an "Acute Care Hospital" rather than an LTCH reflects the long-term plan for the facility to be an ACH.

2

Agreement "in order for us to share any information with [SDP]…so they could assess…the potential of acquiring our lease." App.2; 6RR135. LTT would not have disclosed any information about its facility to Defendants without the Confidentiality Agreement. 6RR135-36.

LTT provided information to Defendants as negotiations continued. *See* PX15; PX379; PX61; PX359; RR143-34. On Sept. 15, 2009, the parties executed the LOI, through which Defendants "reaffirm [their] interest in the acquisition of the" LTT lease "as the initial campus for" LRMC. App.1.

B.    LTT shares confidential information with Defendants pursuant to the LOI.

After the LOI was executed, at Defendants' request, construction on LTT's hospital "was postponed in key areas." 6RR152. At the time, completion was "probably three months" away. 8RR130. Berry testified that the delay was costly, so the best efforts provision in section 3 of the LOI was important to LTT. 6RR151. Berry testified that section 6 of the LOI—which prohibited the parties from using information obtained in the project discussions for their own benefit even in the future—was also critical. 6RR156.

Defendants also interpreted the confidentiality and non-circumvention provisions as continuing beyond termination. On Jan. 14, 2011, Frank Sossi—a founder, officer, outside general counsel, and board member of SDP and LRMC—explained:

3

> Based on our Letter of Intent with [LTT],…we are greatly concerned that the Section 6 (Standstill and Non-Circumvention) and Section 9 (Confidentiality) provisions of that Letter of Intent, both of which survive any termination of that Letter of Intent, require [LTT] to have positive obligations to SDP and LRMC regarding any information exchanged related to that Letter of Intent. *Those obligations specifically require that the Parties act in good faith and that any knowledge gained in the discussions not be used by the Parties for their own benefit.*

PX45; PX442 (emphasis added). Sossi's contemporaneous correspondence also demonstrates that Defendants viewed both LRMC and SDP as parties to the LOI.

Pursuant to the LOI, LTT gave Defendants significant confidential information regarding virtually every aspect of their hospital. *See, e.g.*, PX385 (Alexander asks for diligence); PX353-358 (operational agreements); PX422 ("most current set of hospital plans"); PX341 ("mechanical & electrical specification plans"); PX386 (contract file); PX344 (specific pages from architectural drawings); 8RR125 (CAD file of architectural drawings); PX345 (architectural specs); PX 360-61 (information regarding equipment and vendors); PX 362, 365 (costs); DX59 (SDP officer seeking information). LTT also allowed Defendants' consultants to tour the hospital and participate in construction meetings. 6RR172. The purpose of this information sharing was to facilitate Defendants' acquisition of LTT's lease under the LOI.

On Oct. 21, 2009, Defendants' architect, Page Southerland Page, produced a report based on its analysis of the confidential information LTT provided. PX368

4

(the "PSP Report"). The PSP Report raised three concerns regarding LTT's hospital: (1) code violations; (2) inadequate parking; and (3) cost to convert to Defendants' use. *Id.*[2] Alexander sent the PSP Report to Sossi and LTT's lender Scott Brinker. PX32. Sossi would later repeat the three concerns from the PSP Report.

Even after the PSP Report, Defendants continued to negotiate towards acquiring LTT's lease. *See, e.g.*, DX60; PX451; PX425; PX79. LTT relied on those assurances: "we continued to standstill with our project. We did not make public announcements about our project at that time. And we…continued to hold off on construction in areas where they had changes that they wanted to make." 6RR195. Defendants consistently represented that they wanted to proceed and acquire the lease under the LOI. Until they didn't.

C. Defendants manipulate the LOI diligence process to game the HUD mortgage guaranty process.

On June 3, 2009, shortly after executing the Confidentiality Agreement, Defendants met with officials at HUD to discuss obtaining Section 242 hospital mortgage insurance for LRMC. Section 242 insurance is only available for hospitals in areas that are underserved. 12 U.S.C. § 1715z-7(a); 24 C.F.R. § 242.16.

---

[2] LTT disagreed with the PSP Report's concerns, and its architects "responded to every item." 6RR180; PX462; 8RR131-41. The Texas Department of Health inspected the LTT facility the day after the PSP Report and found 6 code violations, as compared to 71 in the PSP Report. DX56; 6RR184-85; 8RR142-43.

1250216

Defendants received preliminary approval of their HUD application before discussions with LTT. PX55. LTT did not know about the HUD application, and Berry testified he would not have contracted with Defendants had he known, because the standstill caused LTT delay at a time when "we had a significant competitive advantage in that market in that our facility was near completion, and …I don't know that they'd even started to move dirt or not." 8RR64-65.

Defendants never disclosed to HUD the LOI or that LTT was building a hospital a half-mile away. PX167; 10RR11, 14 (HUD representative Robert Deen); 11RR20 (Alexander never told HUD about LTT even though he "knew that LTT planned to open as a general acute care facility"). Indeed, just a few days before the meeting with HUD, Alexander asked Berry to hold off announcing that LTT would open as an ACH rather than an LTCH. PX61, PX26.

A condition of a Section 242 guaranty is that the area be underserved, so LTT's proximity as a competitor was critical, and Defendants should have disclosed it. Defendants' HUD expert said:

> I think HUD as an independent party would need the info. Hopefully it was provided to HUD with disclosure of earlier encumbrances (the letter of intent and confidentiality agreement). I think HUD would have been negligent if they hadn't gotten the info. They could have been crucified for not doing due diligence. Taxpayers would demand full review.

10RR88-89.

6

Defendants were aware that they should disclose LTT to HUD. Their application—which does not mention LTT—was submitted less than two weeks before the LOI. While the application was pending, Sossi sent an e-mail to SDP consultants with the subject line: "DO NOT DISCUSS WITH HUD—Questions on 'existing' or 'acquired lease.'" PX177. In that e-mail, Sossi discussed the pending acquisition of the LTT lease:

> One of the alternatives has been an attempt to acquire the Long Term Acute Care Hospital being constructed around the corner form [sic] the LRMC acute care facility….At present the facility could be converted to a general acute care hospital as a first step in a Main Campus approach for LRMC.

PX177. Sossi recognized that LTT's facility was readily converted to an ACH: "We believe we can get the facility opened…configured in a manner to allow a real acute care hospital to function during the construction period for LRMC…." *Id.* Sossi acknowledged LTT's hospital was a competitor. PX169 (11/12/09 Sossi e-mail: Defendants could lease LTT hospital and "configure it as a general acute care hospital that could be open about 24 months in advance of LRMC and eliminate a potential competitive facility").

On Mar. 17, 2010, HUD approved Defendants' application, which gave Defendants a mortgage guaranty of $166 million with estimated savings of $65,557,605 over the life of the loan. PX85; PX72 at SDP6874; 11RR28. On Mar. 22, 2010, Sossi informed Brinker that there would be no deal under the LOI.

7

PX35. Brinker responded that Berry would follow up "with respect to the LOI, including the confidentiality provision." *Id.*

## D.    Defendants use LTT's confidential information to secure the HUD guaranty.

LTT and its counsel followed up with Alexander regarding the return of confidential information that LTT had provided under the LOI. PX81. On May 10, 2010, Alexander promised that all materials were returned and he had instructed his staff to delete any electronic materials. *Id.*; PX82; 11RR81. But *that same day*, Defendants used LTT's confidential information for their own benefit to secure the HUD guaranty.

Rip Miller, CEO of a Westlake hospital, sent HUD an e-mail questioning the guaranty because "there is a similar private hospital about ½ mile away, directly behind the US Post Office, about 90% completed and scheduled to open this summer." PX179. Miller noted that LTT's hospital "will be in direct competition to your guaranteed project" and the "area is clearly NOT underserved." *Id.* This was the first HUD heard of LTT. 10RR12. On receiving Miller's inquiry, Deen contacted Defendants' consultant and asked about the "new hospital behind the post office." App.5. Sossi answered Deen's questions on May 10, 2010. App.5 (the "May 10 e-mail"). Sossi never sent the inquiry to LTT. 12RR115.

At the time of Miller's inquiry, Defendants were desperate to get the HUD funding; HUD was "the only viable option we had" to get financing for LRMC.

8

1250216

11RR216. In the May 10 e-mail Sossi argued that LTT is not a competing hospital (and thus HUD should fund the pending $166 million loan guaranty), and he invoked the same three concerns from the PSP Report: (1) code violations; (2) inadequate parking; and (3) cost to convert to Defendants' use. App.5. Sossi insisted at trial that he gleaned this information about the LTT facility based on a visit to the construction site in May 2009, and he prepared the May 10 e-mail not based on the PSP Report, but from "what was in my head." 12RR143-44, 159. Sossi entered the fenced LTT construction site as a trespasser: "uninvited and without permission." 13RR6-7.

HUD responded to Miller, parroting the May 10 e-mail and stating that HUD did not believe the LTT hospital was a competitor because it could not meet "general acute licensing standards without expensive redesign/reconstruction and will not achieve general acute care zoning because of site limitations." PX179. Ten days later, HUD agreed to go forward on the guaranty and issue amendments Defendants had requested. PX86.

After learning of HUD's communication with Miller, LTT's counsel asked HUD to postpone closing on the guaranty pending a full review, given that LTT had not been disclosed during the application process. PX181. HUD forwarded the letter to Sossi, who responded, once again, with confidential information obtained pursuant to the LOI. App.6 (the "June 21 letter"). The June 21 letter

9

1250216

represented that plans for LTT "were discussed in detail with the HUD client services team," confirming that Defendants' communications with HUD regarding LTT were not limited to the May 10 e-mail. *Id.*

SUMMARY OF ARGUMENT

This case was well-tried, the jury's findings are well-supported by the evidence, and the judgment is proper. This Court should reject Defendants' challenges on appeal, because they are divorced from the actual case tried and the actual evidence presented.

The jury's causation determinations rest on the reasonable inference that, in making its decision to grant Defendants the guaranty, HUD relied on Defendants' communications in violation of the LOI—including the May 10 e-mail, the June 21 letter, and the discussions "in detail" that Defendants had with HUD regarding whether LTT was a competitor. Defendants' contention that HUD could have based its decision on communications with LTT is absurd; that is not a reasonable inference from the evidence, and it is certainly not equally probable.

The jury's award of $7.9 million for lost fair market value of LTT is supported by sufficient evidence and judicial admissions by Defendants' counsel, particularly when viewed in light of the charge's mitigation instruction. Fair market value can properly be based on the value a willing buyer and willing seller agreed to, and it is undisputed that value for LTT was $7.9 million. Moreover, the

10

jury could reasonably have calculated that sum by accepting the testimony that fair market value was $13.8 million, but the loss could be mitigated by the sale of certain equipment and land.

The contention that SDP is not a party to the LOI and cannot be liable for its breach is almost frivolous. SDP undertook numerous express obligations under the LOI, and Sossi expressly invoked the LOI's standstill, confidentiality, and non-circumvention provisions on behalf of both SDP and LRMC. Moreover, Sossi's overlapping roles support a reasonable inference that his various communications with HUD were made for both SDP and LRMC.

There was no *Casteel* error in the charge, because the broad form liability and damages questions did not impliedly mix valid and invalid theories. There was no evidence or argument at trial that Defendants breached section 2 of the LOI, so there is no possibility that the jury based its finding of breach on an invalid basis. As a threshold matter, moreover, section 2 is enforceable, so it was not an invalid theory at all.

## ARGUMENT

A. <u>Ample evidence supports the jury's causation finding.</u>

Defendants' HUD guaranty caused LTT's investor support to dry up and "doomed the LTT project." 9RR208; 13RR121-23. Defendants concede the point; they do not challenge that they breached the LOI or whether their securing the

11

HUD loan caused harm to LTT. Instead, Defendants argue narrowly that there is insufficient evidence that Defendants' communications with HUD in breach of the LOI caused HUD to issue the loan commitment, grant amendments that would save LRMC tens of millions of dollars over the life of the loan; and close and defend the loan. Brief at 19-24. They attempt to parse inferences available from the evidence, but Defendants' reliance on the equal inference rule is misplaced. The evidence—and the only reasonable inferences flowing from the evidence—support the jury's causation findings.

1. The equal inference rule applies only when multiple reasonable inferences are equally probable.

The equal inference rule provides that "a jury may not reasonably infer an ultimate fact from meager circumstantial evidence which could give rise to any number of inferences, none more probable than another." *Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001) (citations omitted). Under the rule, "circumstantial evidence is not legally insufficient merely because more than one reasonable inference may be drawn from it." *Id.* "If circumstantial evidence will support more than one reasonable inference, it is for the jury to decide which is more reasonable… ." *Id.* at 148-49.

The mere existence of multiple reasonable inferences is thus not the end of the inquiry under the equal inference rule. Rather, the rule applies only when none of the reasonable inferences is more probable than any other. *Hancock v. Variyam*,

12

400 S.W.3d 59, 70-71 (Tex. 2013). In *Hancock*, a professor sued a colleague who sent a defamatory letter to faculty. *Id*. at 62. The letter was also sent to an entity reviewing accreditation for the professor's department, but there was no evidence of who within the entity received the letter. *Id.* at 70. The plaintiff argued that the denial of accreditation was evidence that the letter damaged the professor's reputation with the entity. *Id.* Because there was "no evidence that the inference regarding the letter was more probable than other possible inferences," the Court held that the denial of accreditation was insufficient to establish that the unsolicited letter damaged the professor's reputation with the entity. *Id.* at 70-71.

The equal inference rule thus provides that when circumstantial evidence does not make one competing inference more probable than the other, the jury may not reasonably infer either. *See Lozano*, 52 S.W.3d at 148; *USAA Cty. Mut. Ins. Co. v. Cook*, 241 S.W.3d 93, 101 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (equal inference rule not applicable where competing inference could not be equally inferred).[3] The rule has no application where, as here, substantial evidence supports the reasonable inference that Defendants' communications with HUD caused HUD to issue and defend the guaranty, and no contrary inference is even reasonable, let alone equally probable.

---

[3] The additional cases Defendants cite are consistent in applying the equal inference rule only where there are truly equal inferences, and neither is more probable than the other. *See Burbage v. Burbage*, 447 S.W.3d 249, 262-63 (Tex. 2014); *Jelinek v. Casas*, 326 S.W.3d 526, 536-38 (Tex. 2010); *Marathon Corp. v. Pitzner*, 108 S.W.3d 724, 739 (Tex. 2003).

13

2. <u>There are no equal inferences from the evidence; the only reasonable inference is that HUD relied on Defendants.</u>

By law, HUD may only insure mortgages for "urgently needed hospitals." 12 U.S.C. § 1715z-7(a). Information about potentially competing hospitals, such as LTT, was therefore critical to whether HUD could guaranty Defendants' loan. HUD would have been "negligent" if it did not consider whether LTT was a competing hospital and "would have been crucified for not doing due diligence." 10RR88-89.

The following chronology demonstrates HUD's reliance on Defendants' communications in making its decisions:

- <u>March 17.</u> HUD made the initial loan commitment.[4] 10RR10-11. Defendants had not disclosed LTT's existence to HUD. 10RR13-14. HUD thus committed without knowing that LTT was a potential competitor hospital.

- <u>April 30.</u> Defendants requested amendments for a more favorable interest rate. PX85; 11RR74-77.

- <u>May 8.</u> Miller informed HUD that LTT was a nearby competitor to LRMC, arguing that "[t]his area is clearly NOT underserved." PX179. The loan and amendments were still pending.

---

[4] An initial commitment is not binding, and HUD could have rescinded it based on the failure to disclose LTT as a competitor. 12 U.S.C. § 1709(e) allows HUD to rescind at any time for misrepresentation in securing Section 242 mortgage insurance.

14

- May 10. HUD representative Deen contacted Defendants (not LTT) and requested detailed information about LTT. App.5 at 3. Deen noted: "*[a]nything you can tell me about the [LTT] Hospital will be helpful.*" *Id.*

- May 10. Sossi responded to Deen with the May 10 e-mail—addressed in a familiar way to "Bob." Sossi's arguments regarding whether LTT was a competitor could only be based on confidential information. App.5; *see* 6RR228-30, 178-79. Deen contacted SDP personnel to verify what he called "Mr. Sossi's facts" from the May 10 e-mail. 1CR2170; 10RR16.[5]

- May 11. HUD responded to Miller, parroting Sossi's arguments and stating that LTT's facility was not a competitor. PX179. HUD's defense of the initial commitment was thus based directly on information Defendants provided HUD in violation of the LOI.

- May 20. HUD agreed to go forward and issue the amendments Defendants had requested. PX86; 11RR83-84. The loan closed and funded the next day. 11RR84-85.

---

[5] When Deen's deposition testimony was read at trial, the court reporter transcribed "Mr. Sossi's facts" as "Mr. Sossi's fax." *Compare* 10RR16 *with* 1CR2170. Deen had an opportunity to review and correct his deposition testimony, indicating that "Mr. Sossi's facts" is the correct transcription. *See* Tex. R. Civ. P. 203.1.

15

- June 11. Concerned that HUD based its decision on incomplete information, LTT's counsel requested that HUD stay the loan pending a review. DX116. HUD did not ask for further information from LTT, but, once again, sent the inquiry to Defendants. PX181.[6]

- June 21, Sossi responded to HUD that the plans for LTT "were discussed in detail with the HUD Client Service Team" and informed HUD that Defendants "expect HUD to defend the decision to issue the Guarantee." App.6. Defendants thus admitted that their "detailed" discussions with HUD about LTT influenced HUD's determination that Lakeway was underserved for the purpose of issuing the guaranty. The same day HUD received Sossi's June 21 letter, it responded to Sossi that he can be "assured HUD intends to defend the guarantee." PX182.

HUD relied on Sossi to such an extent in its decisions to issue and defend the guaranty that Deen—who handled LRMC's application and testified as HUD's corporate representative—thanked Sossi for providing information regarding LTT: "Well done good and faithful solicitor!" PX184. Defendants also worked closely

---

[6] Defendants contend that it is an equally reasonable inference that HUD defended its decision on the LRMC loan "based on information LTT provided." Brief at 21. That contention is nonsensical, given that the only communication between HUD and LTT was counsel's letter urging HUD to stay the loan pending further review, and HUD's reaction was to forward that letter to allow Sossi to weigh in. PX181.

16

1250216

to help HUD resist LTT's FOIA request for information HUD relied on when determining the Lakeway area was underserved. PX136; PX182; PX187; PX188; PX87; 12RR121-22, 124-261.

Given this evidence, HUD's motivation to avoid appearing negligent in approving the guaranty, and its joint efforts with Defendants to avoid disclosing the lack of investigation, the only reasonable inference is that Defendants' disclosures in breach of the LOI resulted in HUD's decision to close, fund, and defend Defendants' guaranty. There is no other reasonable inference from the evidence, and certainly not one that is equally probable.

B.   The damages findings are supported by sufficient evidence.

1.   LTT was a proper assignee of Berry and McDonald.

Defendants' position that LTT, as assignee of Berry and McDonald's claims under the LOI, cannot recover damages ignores long-settled Texas precedent, the plain language of the LOI, and the evidence.

First, Defendants argue LTT's principals cannot recover damages for LTT's loss in market value, citing *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990). Brief at 27. While *Wingate* recognized the general rule that "a corporate stockholder cannot recover damages personally for a harm done solely to the corporation," it reiterated this equally well-established exception: "This rule does not, of course, prohibit a stockholder from recovering damages for wrongs done to

17

him individually, 'where the wrongdoer violates a duty arising from a contract or otherwise, and owing directly by him to the stockholder.'" *Wingate*, 795 S.W.2d at 719. The exception applies exactly here, where Defendants violated duties arising under the LOI that Defendants owed directly to Berry and McDonald.

In support of this exception, the *Wingate* court cited *Stinnett v. Paramount-Famous Lasky Corp.*, 37 S.W.2d 145, 149-151 (Tex. Comm'n. App. 1931, holding approved). *Stinnett* is instructive. In that case, shareholders alleged that the defendants' conduct forced their theater out of business and compelled them to "sell their business at great sacrifice." *Id.* at 149. The Court rejected the argument that only the corporation could recover damages for the destruction of its business, holding that if "the wrongful acts are not only wrongs committed against the corporation, but also violations of duties arising from contracts or otherwise and owing directly to the injured stockholders, the stockholders should be permitted to file and maintain a suit for injuries sustained as a stockholder and as an individual." *Id.* at 150-51.[7]

Berry and McDonald were parties to the LOI. App.1. LTT was wholly owned by Berry and McDonald, so they owned a personal property interest in

---

[7] Other courts agree that shareholders may recover for the loss of value to their company when that loss results from the shareholder's individual cause of action. *See, e.g., Empire Life Ins. Co. of America v. Valdak Corp.*, 468 F.2d 330, 336 (5th Cir. 1972); *Faour v. Faour*, 789 S.W.2d 620, 622 (Tex. App.—Texarkana 1990, pet. denied) ("a shareholder may sue for violation of his individual rights, regardless of whether the corporation also has a cause of action").

18

LTT. 6RR98-99; Tex. Bus. Orgs. Code Ann. § 101.106(a). As is discussed below, Defendants' breach of the LOI resulted in a significant loss in value of LTT and its assets. When Defendants destroyed LTT by breaching their contract with McDonald and Berry, they destroyed McDonald's and Berry's personal property. Texas law allows Berry and McDonald recover this loss in value. *See Stinnett*, 37 S.W.2d at 151 (shareholders could recover damages resulting from destruction of business in breach of duty owed to shareholders); *Empire Life Ins. Co. of Am.*, 468 F.2d at 336 (pledgor shareholder could damages based on loss in value to pledged stock); *Alonysius v. Kislingbury*, No. 01-13-00147-CV, 2014 WL 4088145 at *4 (Tex. App.—Houston [1st Dist.] Aug. 19, 2014, no pet.) (mem. op.) (corporation's owner could recover corporate funds diverted in breach of owner's contract).

Berry and McDonald assigned their causes of action to LTT. PX421; 8RR163-64. Under the assignment, LTT is free to assert the principals' right to sue for damages they suffered, including recovering damages for the loss in value of LTT and its assets. *See Stinnett*, 37 S.W.2d at 151; *Empire Life Ins. Co. of Am.*, 468 F.2d at 336; *Alonysius*, 2014 WL 4088145 at *4.

Defendants argue that disclosure or use of *LTT's* confidential information could not create liability or damages. Brief at 26. The LOI is not so restrictive. Section 6 prohibits the use of "any knowledge" or the sharing of "any information" gained in the development process for the LTT project. App.1. Section 9 provides

19

that "all information" disclosed by any party at any time in connection with the LTT Project was subject to its confidentiality obligations. *Id.* The broad protections of sections 6 and 9 encompass any LTT information disclosed during the Project review. 6RR90-91.

This Court should reject Defendants' attempt to parse interests between LTT, Berry, and McDonald.

> 2. <u>Ample evidence supports the jury's award of $7.9 million in lost fair market value of LTT.</u>

Defendants' challenge to the jury's award of $7.9 million in lost fair market value is contrary to recent Supreme Court precedent and ample evidence.

> a. <u>*Phillips v. Carlton* confirms that fair market value can be based on an agreed purchase price.</u>

Defendants' legal and factual sufficiency challenge to the $7.9 million loss in LTT's fair market value is governed by *Phillips v. Carlton Energy Group, LLC*. ___ S.W.3d ___, No. 12-0255, 2015 WL 2148951 (Tex. May 8, 2015). In *Phillips*, the defendant contracted with the plaintiff to invest $8.5 million for a 10% interest in an oil and gas concession owned by a third party. *Id.* at *4. Prior to funding the investment, the defendant attempted to eliminate the plaintiff from the deal by terminating its contract with the plaintiff and convincing the third party to terminate its contract with the plaintiff, stripping the plaintiff of a 38% interest in the concession. *Id.* The defendant then entered a new contract with the third party

20

and began developing the prospect. *Id.* The plaintiff filed suit to recover the fair market value of its 38% interest. *Id.* at *5.

The plaintiff advanced three different models of determining the fair market value. *Id.* at *5-6. The first two models, based on the value of gas in the ground, yielded two alternative value ranges. *Id.* The third model was based on the defendant's original unfulfilled agreement with plaintiff to pay $8.5 million for a 10% interest, which extrapolated to a fair market value of $31.16 million for the plaintiff's 38% interest. *Id.* at *6. The jury awarded $66.5 million, reduced by a remitter to $31.16 million. *Id.* at *7.

On appeal, the Court held that "when lost profits are not sought as damages themselves but are used to determine the market value of property for which recovery is sought," the lost profits must be shown with reasonable certainty. *Id.* at *10. However, *Phillips* explained that the reasonable certainty requirement "should not be used to deny a claimant damages equal to the value the market would have placed on lost property." *Id.* While the *Phillips* Court held that the first two damage models were not reasonably certain, it held that calculating the $31.16 million value for the 38% share from the $8.5 million the defendant was willing to pay for a 10% share was legally sufficient evidence of fair market value, noting that this "calculation is based on an actual offer by a willing buyer – [defendant] – to a willing seller – [plaintiff]." *Id.* at *11; *see also Pleasant v.*

21

*Bradford,* 260 S.W.3d 546, 559-60 (Tex. App.—Austin 2008, pet. denied) (purchase price agreed to by parties constitutes sufficient evidence of property's value as represented).

> b. The evidence and Defendants' judicial admissions establish that $7.9 million was the fair market value for LTT.

Berry testified that fair market value could be determined by the price a willing buyer would pay a willing seller. 8RR100. Berry then testified, using the net income methodology, that LTT's fair market value was $13.8 million before Defendants' breach. 8RR100-03; *see also* 8RR82-99; PX416. LTT's fair market value was rendered virtually worthless by Defendants' breach. 8RR102-03. While the $7.9 million awarded by the jury falls squarely within the range of loss to fair market value Berry testified about using the net income methodology, consistent with the holding in *Phillips*, there is other evidence that *directly* establishes $7.9 million as a measure of LTT's fair market value prior to breach.

LTT's principals Berry and McDonald were willing sellers and Defendants were willing buyers of LTT's operations in Lakeway for $7.9 million under the LOI. App.1; 12RR171. Sossi testified that the amount to be exchanged when the deal closed would be between $7.5 million and $8.5 million. *Id*. When asked by Defendants' counsel about the amount of consideration that the parties had agreed upon in the LOI to acquire the hospital, LTT's expert testified that the sum was $7.9 million. 13RR103-05.

1250216

In addition to that testimony, during his opening statement Defendants' counsel informed the jury that the parties agreed the consideration under the LOI was $7.9 million: "You heard what counsel said, approximately $7.9 million was what was going to be paid." 6RR60. Defendants' counsel made a similar argument in closing, moments before telling the jury that "fair market value is…the price a willing buyer and a willing seller can agree to":

> [W]e were going to give them about $8 million under the terms of the LOI, but what was that for? Was that just for the information, or was that for the opportunity to take over the actual bricks and mortar facility? We weren't paying $8 million for information. We were considering paying $8 million in terms of the 1.5 lump sum payment, plus taking on some of their debt, we were willing to do that to take the facility.

14RR106-07.

Defense counsels' clear, deliberate, and unequivocal declarations in open court are judicial admissions that preclude Defendants from disputing that the fair market value of LTT was $7.9 million. *Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 905 (Tex. 2000); *Medina v. Hart,* 240 S.W.3d 16, 24 (Tex. App.—Corpus Christi 2007, pet. denied); *Benton v. State,* 336 S.W.3d 355, 360 (Tex. App.—Texarkana 2011, pet. ref'd); *Hughes v. Pearcy*, No. 03-10-00319, 2014 WL 7014353, *5 (Tex. App.—Austin 2014, pet. denied) (mem. op.) (attorney's "admi[ssion] during closing arguments that [client] failed to comply with the licensing agreement" constituted a judicial admission). Defendants' judicial

23

admissions regarding LTT's fair market value, along with Berry's testimony that LTT was rendered virtuously worthless as a result of Defendants' actions, are factually and legally sufficient to support the jury's award of $7.9 million in lost market value. *Phillips*, at \*11.

c.      $7.9 million is within the range of evidence of LTT's lost fair market value, particularly in light of the mitigation instruction.

"Where there is proof to support a range of damage options, the mere fact that nothing in the record shows how the jury arrived at a specific amount is not fatal to the verdict." *McMillin v. State Farm Lloyds*, 180 S.W.3d 183, 202 (Tex. App.—Austin 2005, pet. denied). Consequently, "'[e]vidence corresponding to the precise amount found by the jury is not essential' in order to withstand a legal-sufficiency challenge." *Pleasant*, 260 S.W.3d at 559. A damage award "is not per se arbitrary because it does not match up precisely with figures presented by expert testimony." *Id*. at 560. As long as there is a rational basis for the award, "a jury's finding will not be disregarded merely because its reasoning in arriving at the award may be unclear." *Id.* at 559.

At Defendants' request the jury was instructed in the damages question to reduce LTT's damages by amounts "LTT could have avoided by the exercise of reasonable care." App.4 Q6. Defendants do not contend that the jury did not follow the mitigation instruction; their brief is silent on the issue. The evidence on

24

mitigation provided an independent basis for the jury to find LTT's fair market value was $7.9 million.

Berry testified that the pre-breach value of LTT was $13.8 million, and post-breach LTT was "virtually worthless" except for the value of equipment that could be sold for "about 60 percent of the historical cost." 8RR102-03. The historical cost of the equipment was $1,360,000. PX416 at 19RR471. Berry also testified that, after Defendants' breach, LTT sold the land on which the hospital was built for $4-5 million. 9RR164-65. Based on this evidence, the jury could have found LTT suffered a fair market value loss of $13.8 million but that the loss could be mitigated by the sale of equipment and land. If the jury followed the mitigation instruction, it easily could have found damages of $7.9 million. Indeed, if the jury reduced the damages by exactly 60% for the equipment and $5 million for the land, the damages would be $7,984,000—within 1% of the $7.9 million awarded. When combined with evidence that $7.9 million was the price Defendants agreed to pay for LTT's hospital, it is plain that the record supports the jury's award of $7.9 million for the lost fair market value of LTT.

### d. Relying on the agreed purchase price does not conflict with the summary judgment ruling regarding section 2.

Defendants argue that the verdict may not rest on the agreed $7.9 million purchase price under the LOI, because "allowing LTT to recover the amount Berry and McDonald would have received under Section 2 conflicts with Judge

25

Yelenosky's summary judgment order." Brief at 44. As is discussed in LTT's opening brief of appellant, the summary judgment as to section 2 was error. If this Court agrees, it need not address this argument challenging the damages award.

In addition, looking to the agreed consideration does not *ipso facto* transform the award into impermissible benefit of the bargain damages. Defendants cite no authority for the proposition that the consideration contemplated by the parties cannot provide the "fair market value" of property, if that is an appropriate measure of consequential damages for a contract claim.[8] Indeed, that is exactly what the Court in *Phillips* did: the consideration contemplated in the contract between the defendant and plaintiff was sufficient to establish the lost fair market value caused by the defendant's tortious interference with the plaintiff's contract. 2015 WL 2148951 at *11.

*Bohnsack v. Varco, L.P.* is instructive. 668 F.3d 262 (5th Cir. 2012). *Bohnsack* arose out of negotiations between an inventor and the defendants to patent and acquire a cleaning device for drilling fluids. The parties "agreed in principle" on the amount defendants would pay to acquire the invention. *Id.* at 270-71. The negotiations fell through and a dispute arose over the harm caused by

---

[8] Defendants cite *Haase v. Glazner*, which holds that a party cannot recover benefit of the bargain damages for a fraud claim when the contract is unenforceable. 62 S.W.3d 75, 800 (Tex. 2001). LTT sought lost fair market value as consequential, not benefit of the bargain, damages, and Defendants do not argue on appeal that the other provisions of the LOI (*e.g.*, sections 3, 6 and 9) were unenforceable, making *Haase* inapposite.

26

the delay and defendants' actions. The jury awarded the inventor $600,000 as benefit-of-the-bargain damages for the fraud claim and $600,000 as reasonable royalty damages for the misappropriation of trade secrets claim. *Id.* at 272. The Fifth Circuit reversed the $600,000 benefit-of-the-bargain award because the "agree[ment] in principle" was not an enforceable contract between the parties. *Id.* at 275-76. However, the Fifth Circuit upheld the $600,000 reasonable royalty for misappropriation based on the consideration contemplated in the unenforceable "agree[ment] in principle," holding that the "terms negotiated between [the parties] are sufficient evidence to prove the value" of the confidential information. *Id.* at 280. Similarly, while Judge Yelenosky found section 2 unenforceable, the consideration agreed by the parties under the LOI is sufficient to support the amount of loss in fair market value to LTT. *Id.; see also Pleasant*, 260 S.W.3d at 559 (holding purchase price agreed to by parties constitutes sufficient evidence of property's value as represented).

e. The measure of damages does not impermissibly "mix and match" methodologies to calculate fair market value.

Defendants contend that LTT cannot "mix and match" measures of lost fair market value other than the net income method Berry used. Brief at 45. That contention is without merit; in *Phillips*, the Court considered three different lost fair market value damage methodologies. 2015 WL 2148951 at *5-6 & 11.

27

The requirement that a party determine lost profits based on "one complete calculation" does not mandate a single damages methodology. For example, while *Holt Atherton* held that lost profits must be determined by "one complete calculation," this Court subsequently explained that *Holt Atherton* applies to the calculation itself rather than the damage model. *Compare Holt Atherton Industries, Inc. v. Heine*, 835 S.W.2d 80, 85 (Tex. 1992) *with Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, 184 S.W.3d 840, 887, 889 (Tex. App.— Austin 2006, pet. granted, judgm't vacated w.r.m.) (holding "there is sufficient evidence that [plaintiff] incurred lost profits damages based on two measures," and suggesting remittur to allow recovery under the larger measure).

The jury could determine LTT's lost fair market value by considering the testimony and Defendants' judicial admissions. *Id.*; *see also Phillips*, 2015 WL 2148951 at *5-6 & 10-11; *Pleasant*, 260 S.W.3d at 560 (the "jury can depart from expert valuations if other evidence presented at trial is sufficient for them to do so," and holding that five different appraisal models gave the jury a range of values to support damages awarded). Based on Texas law and the totality of the record, the evidence is sufficient to support the damages awarded.

3. Berry's testimony was not conclusory or speculative.

Defendants contend that Berry's opinion of LTT's lost market value was conclusory, speculative, and "lacking in reasonable certainty." Brief at 31-38. That

28

contention is wrong, but as discussed above, even without Berry's testimony, the evidence is sufficient to support the jury's $7.9 million award.[9]

Further, Defendants failed to object or request a limiting instruction to Berry's testimony regarding market value, so any challenge to the sufficiency of that testimony is waived. *See Coastal Transp. Co., Inc. v. Crown Central Petroleum*, 136 S.W.3d 227, 229 (Tex. 2004) (objection required to preserve challenge to "underlying methodology, technique, or foundational data used by expert witness); *City of Dallas v. Redbird Development Corp.*, 143 S.W.3d 375, 385 (Tex. App.—Dallas 2004, no pet.) (complaint about lost profit calculations by plaintiff's president constituted an "attack on the methodology, technique, and foundational data" that defendant failed to preserve); *Duke Energy Field Services, L.P. v Meyer*, 190 S.W.3d 149, 153 (Tex. App.—Amarillo 2005, pet. denied) (defendant's failure to object or seek limiting instruction to owner's opinion evidence "waived its complaint to the general admission of the evidence.")

When an expert's "underlying methodology is challenged, the court 'necessarily looks beyond what the expert said,'" so a timely objection is required for the court to "evaluate the underlying methodology, technique, or foundational data." *Crown Central*, 136 S.W.3d at 233. Here, Defendants attack Berry's

---

[9] Defendants do not dispute that Berry, as LTT's CEO and managing member with familiarity of LTT's operations and assets could testify regarding the value of LTT and its assets. *Reid Road Mun. Utility Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 854-55 (Tex. 2011).

methodology, technique, and foundational data, contending that he failed to explain: (i) "key pieces of his pro forma," (ii) his reliance on an allegedly "factually incorrect pro forma," (iii) "his assumed 'extraordinarily high' occupancy rate," (iv) "inconsistencies in his testimony," and (v) his use of a three-year multiplier. Brief at 34-38; *City of Dallas*, 143 S.W.3d at 385. Those challenges require this Court to "look beyond" what Berry said to evaluate the reliability of his testimony, and thus Defendants failed to preserve them.

On the merits, Berry sufficiently explained and tendered facts on lost fair market value. *See City of Dallas*, 143 S.W.3d at 386 (lost profits testimony not conclusory where expert tenders facts to support conclusions). Berry testified that as managing member and CEO of LTT, he has personal knowledge of LTT and its assets. 6RR98-99. He explained that the definition of fair market value was the price a willing buyer would pay a willing seller. 8RR100. Berry testified that the loss in fair market value as a result of Defendants' conduct was "approximately $13.8 million." 8RR100-01. Berry testified that he determined that loss by using the net income methodology to calculate LTT's fair market value prior to the breach, and then subtracting LTT's remaining value after Defendants' breach. 8RR101-03. Berry, who was an experienced CPA and hospital administrator, testified that the net income methodology was generally recognized as a valid methodology and described how it is used. 8RR101-02. Berry explained that

30

valuations are determined by multiplying EBITDA[10] by a period of time that is "typically between three and seven years," and that he used a three-year multiplier because LTT had not yet begun operations. *Id*. Berry explained that he arrived at EBITDA using a detailed, 48-month financial pro forma that he compiled and used for LTT long before Defendants' misconduct came to light. 8RR102, 82-83; RX416. Berry testified that the pro forma was based on a model that he had used many times, it had proven to be reliable, and he tailored it to LTT using objective data. 8RR84-85. Berry provided detailed information about how specific line items in the pro forma were developed and calculated. 8RR85-89.

LTT's damages expert, Tom Glass, testified that he analyzed Berry's pro forma and vouched for "the reasonable certainty of the numbers." 13RR34-35, 37-43; *see also* 8RR43-45. And while Defendants argue that Berry's projected occupancy rate of 81.6% was "extraordinarily high" (Brief at 37), Glass compared Berry's pro forma to SDP's self-described "conservative" pro forma for the LTT facility, and found that SDP projected even more admissions as well as a "95-96%" occupancy rate. 13RR45-47; PX163. Glass testified that SDP's projections for the LTT facility were another factor establishing the reasonableness of Berry's pro forma. 13RR50. Glass also noted that Berry's pro forma projected 22 beds per

---

[10] EBITDA stands for earnings before interest, taxes, depreciation, and amortization. 8RR101.

1250216

day starting out, and ramped up in the following years, consistent with Berry's testimony about the developing market. 13RR121.

Taken together, the evidence is sufficient to support the jury's award. *See City of Dallas*, at 386 (where expert tendered evidence to support lost profits testimony, it is the role of the jury to sort out the evidence and act as "the sole judge of the witnesses' credibility and the weight to be given their testimony").

### 4.    The loss in fair market value was foreseeable.

Consequential damages "result naturally, but not necessarily from the acts complained of." *Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc.*, 348 S.W.3d 894, 901 (2011). To be recoverable, consequential damages must be foreseeable and directly traceable to the defendant's wrongful act and result from it. *Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex. 1998) (per curiam).

Whether consequential damages are foreseeable is an objective inquiry that asks whether the breaching party had reason to foresee the loss as a probable result of the breach at the time the contract was made. *See Restatement (Second) of Contracts* § 351 cmt. a (1981) ("[T]he party in breach need not have made a 'tacit agreement' to be liable for the loss. Nor must he have had the loss in mind when making the contract, for the test is an objective one based on what he had reason to foresee."). A loss is foreseeable if it follows from the breach "(a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary

32

1250216

course of events, that the party in breach had reason to know." *Basic Capital*, 348 S.W.3d at 902 (quoting *Restatement (Second) of Contracts* § 351 (1981)). Because the inquiry is focused on what the party in breach "had reason to know" or what loss follows in "the ordinary course of events," proving foreseeability does not require direct evidence that the parties anticipated the specific loss at the time the contract was made. *Id.* at 902–03.

The Texas Supreme Court recently reaffirmed this principle. In *Basic Capital*, a lender, Dynex, agreed to provide $160 million in financing to Basic for real estate investments. 348 S.W.3d at 896–97. Soon thereafter, market interest rates rose, making the terms unfavorable to Dynex. *Id.* at 897. When Dynex refused to provide further funding, Basic sued for breach of contract. *Id.* At trial, the jury found that Dynex breached the agreement and awarded Basic damages for the increased costs it paid in obtaining alternate financing for some investments and for the profits it lost from other investments for which it could not find alternate financing. *Id.* at 897–98. The court of appeals held "that Basic could not recover lost profits as consequential damages for Dynex's breach of the [$160 million commitment] because there was no evidence that Dynex knew, when it made the Commitment, what specific investments would be proposed, or that other financing would not be obtainable." *Id.*

33

The Supreme Court reversed. *Id.* at 896. The Court held that to be "liable for the consequential damages resulting from a breach of a loan commitment, the lender must have known, at the time the commitment was made, the nature of the borrower's intended use of the loan proceeds but not the details of the intended venture." *Id.* at 903. The Court found that the evidence supported a finding that "Dynex knew that Basic's purpose in arranging the $160 million commitment was to ensure financing" for real estate investments. *Id.* As for the foreseeability of the lost profits resulting from a breach of that agreement, the Court held:

> Dynex certainly knew that if market conditions changed and interest rates rose, its refusal to honor the Commitment would leave Basic having to arrange less favorable financing.…Certain that its breach would increase Basic's costs, Dynex cannot profess blindness to the foreseeability that its breach would also cost Basic business.

*Id.*

Here, there is ample evidence that at the time Defendants entered into the LOI, they had reason to know that a breach of the LOI to gain a competitive advantage over LTT would cause the value of LTT and its confidential information to decrease. To begin with, Defendants touted their prior experience developing hospitals. 11RR121-28, 132-33, 215-16; 12RR139-40. Before entering the LOI, Defendants recognized that LTT was a competitor hospital with a substantial head start on construction. PX25; 10RR167-68; 11RR9-10. Defendants investigated LTT to determine its impact on LRMC, including by having Sossi trespass on

34

LTT's closed construction site. 13RR7-8; *see also* 12RR175-76; 13RR22. During the project review, Defendants asked LTT to delay announcing LTT's plans to open as a general acute care hospital. 11RR12-14: 12RR24-25. This was shortly before Defendants met with HUD, and the evidence shows that Defendants were aware that HUD's knowledge of a nearby competitor could be detrimental to the HUD loan—which was Defendants' "only viable option" to finance LRMC. 11RR20-22, 40-41, 63-64. Defendants considered information provided to HUD about LRMC to have been submitted confidentially, and Defendants recognized that such information in the hands of a competitor could cause "substantial competitive harm." PX187 at 3. Based on this evidence, the jury could reasonably infer that Defendants, as experienced hospital developers in economic conditions that Alexander recognized were "as bad as I've ever experienced in my career," could reasonably foresee that breaching the LOI to gain a competitive advantage would diminish the market value of LTT's nearby facility.

LTT halted construction at Defendants' request, at considerable expense. 6RR151-53. Berry testified that delay was one reason the LOI included the best efforts provision. *Id.* The parties also agreed to the exception to section 6 that allowed LTT to continue discussions with potential equity investors because they recognized that LTT planned on opening and operating its facility if the LOI transaction was not consummated. CE3:0:18:43-0:23:53. And during closing

35

argument, Defendants' counsel conceded Defendants foresaw the possible impact of their actions on LTT's value:

> I want to note the concept of foreseeability. I want to note that every one of these damage questions that you're going to be required to answer means that you will—if you write a number in there, you'll be required to find that the defendants foresaw, they were able to foresee the consequences of these actions. I guarantee you when Frank Sossi sent that letter—sent that e-mail, he had no idea that the plaintiff would come back and say that cost them $34 million. It's just not even realistic. *He thought the facility, if they did it, was worth 7 max.*

14RR112 (emphasis added).

Finally, because of the sensitive nature of the information and the potential competitive impact that could result from a breach, the parties agreed that breach of the confidentiality and non-circumvention provisions of the LOI would mean that "material and irreparable harm shall be presumed," that injunctive relief would be appropriate, and that the non-breaching party would "be entitled to seek all other rights or remedies which the Party may have in law or equity." App.1 §10.1. The parties thus anticipated broad available relief for any breach.

> 5. <u>Ample evidence supports the jury's award of $790,000 in lost fair market value for the confidential information</u>

Evidence also supports the jury's finding of $790,000 in lost fair market value of LTT's confidential information.[11] Berry testified based on his personal knowledge that the fair market value of the confidential information was $7.9

---

[11] The $790,000 award was not included in the judgment because LTT elected to recover the $7.9 million in lost fair market value to LTT. This Court may render judgment for $790,000 if it determines that the $7.9 million award is unsupported.

36

million before Defendants' breach and was rendered virtually worthless as a result of the breach. 8RR104-06, 161-62. The jury found that the lost fair market value was $790,000, a number falling within the pre-breach and post-breach values. As discussed above, "[w]here there is proof to support a range of damage options, the mere fact that nothing in the record shows how the jury arrived at a specific amount is not fatal to the verdict." *McMillin*, 180 S.W.3d at 202. The evidence presented by Berry's testimony provided both the method and range from which the jury could arrive at its verdict, and the jury's award should be upheld on that basis alone.

Defendants again ignore the instruction regarding mitigation. Defendants argued that LTT could have reduced its damages by commencing operations and earning profits. SDP projected that profits from the LTT facility could generate $7-8 million of profits in its first five years of operation, broken out on a yearly basis. PX163; 13RR45-50; 11RR61. Similarly, LTT presented evidence, also broken out on a yearly basis, that it could have earned profits of up to $34.5 million over five years. PX416; 8RR82-89; 13RR34-50. While LTT does not believe that its damages were subject to mitigation, the evidence presented to the jury was sufficient to allow it to determine that the loss in market value to LTT of $7.9 million may have been reduced by mitigation to $790,000. The jury's damages award falls within the range provided and is supported by evidence.

37

6.     In the alternative, remand is proper because there is evidence of some damages.

In the alternative, if this Court determines that there is no evidence to support the specific damage awards, it should remand rather than rendering a take-nothing judgment because there is evidence of some damage to LTT. "Remand in the interests of justice is appropriate in a case where the plaintiff has proved liability and that he has sustained some loss as result, but has failed to prove the amount of damages with reasonable certainty." *Rojas v. Duarte*, 393 S.W.3d 837, 846 (Tex. App.—El Paso 2012, pet. denied); *see also* Tex. R. App. P. 43.3.

C.     SDP's argument that it is not a party to the LOI fails again.

SDP repeats its argument that it was not a party to the LOI and as a result cannot be liable for breach of the LOI. Judge Yelenosky and Judge Livingston rejected this argument, and it should fare no better in this Court.

1.     SDP waived any complaint that it was not a party to the LOI.

The charge defined "Letter of Intent" as "the letter agreement between LTT *and SDP* dated September 15, 2009." App.4 at 12999. SDP did not object to this definition, and SDP cannot complain on appeal that it was not a party to the LOI and should not have been included in the charge questions regarding breach and damages. *See Osterberg v. Peca*, 12 S.W.3d 31, 55-56 (Tex. 2000) (sufficiency of the evidence is measured under the charge). SDP's argument regarding its party status can be disposed of on that basis alone.

38

2.  An agent may be personally liable on contracts made for the benefit of his principal—even where the principal is disclosed.

SDP argues that, because it disclosed its agency relationship with LRMC, it cannot be held liable under the LOI. Brief at 58-59. But it is well established that an agent can be personally liable under a contract, even if the agent discloses that he is acting on behalf of a principal. *See American Nat'l Bank of Houston v. Am. Loan & Mortg. Co.*, 228 S.W. 169, 171 (Tex. Comm'n App. 1921, judgm't adopted) ("An agent, although his agency is known and who has authority to bind his principal through contract, is not precluded from binding himself personally upon such contract."). "The mere fact that an agency relationship exists does not preclude the imposition of personal liability on an express contract with a third party, even though the contract is primarily for the benefit of the principal." *Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc.*, 334 F.3d 423, 428 (5th Cir. 2003). Instead, where an agent "has pledged his own responsibility in addition to that of his principal, he will be bound accordingly." *American Nat'l*, 228 S.W. at 171. The agent's liability is thus not predicated upon the agency relationship, but on the contractual obligations the agent undertakes. *Id.* When the agent has expressed in the contract "an interest of his own, together with his principal, both principal and agent may be held upon the contract." *Id.*

39

3. SDP identified itself as a party to the LOI and obligated itself under the LOI and is consequently individually liable for breach of the LOI.

SDP is identified as a Party to the LOI in section 9, which concerns the confidentiality of the Proprietary Information:

> [A]ll information disclosed by any Party or its Representatives at any time to any other Party or its Representatives in connection with the Project in any manner shall be deemed "Proprietary Information." The term "Representative(s)" means, in the case of LRMC *or SDP*, any director, officer, employee, member, shareholder, or agent of LRMC *or SDP* engaged in the evaluation of the Project. . . .

PX2 at §9.1 (emphasis added). If, as SDP contends, it were acting solely as the agent of LRMC, then SDP would have been included among LRMC's unnamed Representatives, just as LRMC's other agents were. Instead, the LOI lists SDP as a Party with its own Representatives. Berry testified that this language in the LOI meant that both LRMC and SDP were parties to the LOI. 9RR173-174.

In addition, SDP had affirmative obligations under the LOI. For example, SDP took on financial obligations in exchange for disclosure of the Proprietary Information:

> In consideration of the Principals' willingness to enter into this Letter of Intent and disclose Proprietary Information relating to the Lease and the Facility to SDP and LRMC, *SDP shall cause LRMC* to deposit as earnest money the amount of $50,000. . .

App.1 at §4 (emphasis added).

Despite this and other similar covenants (*e.g.*, the provisions of sections 6 and 9 imposing affirmative obligations on each of the Parties regarding the

40

treatment of information exchanged during project review), SDP relies on a single sentence in the LOI to attempt to insulate itself from liability:

> Surgical Development Partners, LLC, ("SDP") is pleased to submit this Letter of Intent, as the agent for LRMC, to each of you (collectively, the "Principals") (each a "Party" and collectively the "Parties") …

Brief at 58. But rather than show that SDP has no independent interest in the agreement, the sentence includes SDP as a Party. The same paragraph further confirms SDP's party status:

> The objective of this Binding Letter of Intent is to **indicate <u>SDP's interest in the Project</u>** and to establish the ground rules for the ongoing exchange of information between the Parties to facilitate the development of the Project and the exchange of information required for such a process to succeed. To clarify this relationship and to best *protect the interests of all of the Parties, the Parties hereto agree* as follows: . . . .

App.1 at 1 (emphasis added). Consistent with this, Alexander signed the LOI as President and CEO of SDP (printing it on SDP letterhead)—not as an agent of LRMC. App.1 at 1, 7; 6RR149; 9RR173-74.

LTT's lawyer in the negotiation of the LOI testified that both SDP and LRMC are parties to the LOI because they are defined as "Parties." CE3:0:4:49-0:6:21&0:9:47-0:10:09; *see also* CE3:0:6:21-0:8:45. Similarly, Sossi, who drafted the LOI on behalf of Defendants, also considered SDP to be a party to the LOI in an email he wrote to LTT's landlord before this lawsuit was filed:

1250216

*Based on our Letter of Intent with [LTT] … we are greatly concerned that the Section 6 (Standstill and Non-Circumvention) and Section 9 (Confidentiality) provisions of that Letter of Intent, both of which survive any termination of that Letter of Intent, require your Tenant to have positive obligations to SDP and LRMC regarding any information exchanged related to the Letter of Intent.*

PX442 at 2 (emphasis added).

SDP is plainly a party to the LOI. SDP's argument that it can avoid liability simply by disclosing its principal fails, as a matter of law, because it incorrectly "presupposes that an agent is necessarily *not* liable on a contract where the other party is aware that it is acting as an agent." *Instone Travel*, 334 F.3d at 430; *Mediacomp, Inc. v. Capital Cities Comm'n, Inc.*, 698 S.W.2d 207, 211 (Tex. App.—Houston [1st Dist.] 1985, no writ) ("an agent of a known principal may be personally liable if the agent…has pledged his own responsibility in addition to that of his principal").

4.      The LOI is not ambiguous regarding SDP's party status, and no jury question was proper.

SDP asserts that the LOI is ambiguous regarding whether SDP was a party to it, and there should have been a jury question as to its party status. Brief at 59. That contention is without merit, for several reasons.

First, SDP did not plead ambiguity, so it cannot raise that issue now. 1CR2659-64; Tex. R. Civ. P. 94. SDP also waived any charge error by failing to

42

object to the definition of LOI as being the "letter agreement between SDP and LTT." App.4 at 12999.

On the merits, the LOI terms and evidence discussed above in Section C.3 establish that the LOI is unambiguous regarding whether SDP is a party.

5.    There is ample evidence that SDP breached the LOI.

SDP argues that it did not breach the LOI, but its argument is based on the false premise that only Sossi communicated with HUD in breach of the LOI, and he did so on behalf of LRMC only. Brief at 60-61. The evidence shows that at all times, Sossi was a co-owner, board member, and general counsel for SDP. 10RR156-57; 12RR79-81. Sossi copied SDP officers and/or employees on the May 10 e-mail and other LTT-related communications to HUD. App.5; PX184; PX187; PX188; PX191; PX428; PX432; PX488. After receiving the May 10 email, HUD reached out to others at SDP to verify "Mr. Sossi's facts." App.5; 10RR16; *see also* 1CR2170. Sossi claimed the protections of the LOI for both SDP and LRMC. PX442.

The jury could reasonably infer from the evidence that Sossi sent the May 10 e-mail, as well as other communications to HUD, on behalf of SDP and LRMC. In addition, SDP communicated with HUD about LTT in respect to the FOIA request and LTT's June 11, 2010 letter. 11RR112-14. Those communications on behalf of SDP provide additional support for the jury to infer, given Sossi's many

43

overlapping roles, that Sossi's communications with HUD were made for both SDP and LRMC.

D.      The trial court properly charged the jury on breach of contract and damages.

Question 1 of the charge is a plain-vanilla, broad form PJC breach of contract question, and Question 6 is the corresponding broad form damages question. App.4. Defendants argue that the broad form questions were flawed under *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex. 2000), because they impliedly mixed valid and invalid liability theories. Specifically, Defendants argue that the jury could have based its findings on section 2 of the LOI, which Judge Yelenosky had ruled was unenforceable. This challenge to the charge fails for two reasons.

First, the charge did not impliedly instruct the jury on an invalid liability theory. As is discussed in LTT's Cross-Appellant's Brief, section 2 was enforceable and should not have been dismissed on summary judgment. Because section 2 was enforceable, there was no reason to exclude it from the breach of contract questions in the charge. *See Traxler v. Entergy Gulf States, Inc.*, 376 S.W.3d 742, 751 (Tex. 2012) (finding no *Casteel* problem when underlying liability theories are valid); *Casteel*, 22 S.W.3d at 388 (requiring submission of an *invalid* theory before presuming harm); *see also Tex. Dept. of Assistive & Rehabilitative Servs. v. Abraham*, No. 03-05-00003-CV, 2006 WL 191940, at *7,

44

n.8 (Tex. App.—Austin Jan. 27, 2006, no pet.) (mem. op.) (declining to remand under *Casteel* where jury question included multiple liability theories, all of which were valid). If this Court determines that section 2 is enforceable there is no need to address this charge issue further.

Second, even if section 2 is not enforceable, the court did not err by submitting the liability and damages questions in broad form. Texas law does not require granulation of each individual factual allegation in support of a single liability theory such as breach of contract, particularly when there was no discussion of breach of section 2 at trial.

1. Background on broad-form submission and *Casteel*

Texas law requires the broad-form submission of jury questions whenever feasible. Tex. R. Civ. P. 277; *see also Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (requiring broad-form submission "in any or every instance in which it is capable of being accomplished."). In *Casteel*, the Supreme Court recognized a limited exception to this rule when a question mixes valid and invalid liability theories, thus injecting error into the question and making it impossible for the appellate court to determine whether the jury based its answer solely on the invalid theory. *Casteel*, 22 S.W.3d at 388. In those circumstances, the error may be presumed harmful. *Id.* The Court has since expanded *Casteel* to

45

other contexts, such as broad-form damages questions that list invalid elements. *See Harris County v. Smith*, 96 S.W.3d 230, 235 (Tex. 2002).

However, the Court has cautioned against expanding the doctrine too far. In *Bed, Bath & Beyond, Inc. v. Urista*, the Court explained:

> When, as here, the broad-form questions submitted *a single liability theory (negligence)* to the jury, *Casteel's* multiple-liability-theory analysis *does not apply*.

211 S.W.3d 753, 757 (Tex. 2006) (emphasis added). And in *Thota v. Young* the Court cautioned against allowing the *Casteel* exception to swallow the rule:

> Notwithstanding *Casteel's* presumed harm analysis in situations that erroneously commingle valid and invalid theories of liability, we have repeatedly reaffirmed our longstanding, fundamental commitment to broad-form submission.

366 S.W.3d 678, 689 (Tex. 2012); s*ee also Harris County*, 96 S.W.3d at 235 ("Neither our decision today nor *Casteel* is a retrenchment from our fundamental commitment to broad-form submission.").

These limits make sense if broad-form submission is to survive in any meaningful way. A fundamental component of broad-form submission is that the jury need not agree on the individual factual allegations, "so long as they agree on the legally relevant result." *Dillard v. Texas Elec. Co-Op*, 157 S.W.3d 429, 434 (Tex. 2005). For example, jurors may agree that a defendant was negligent, "even if half believed the negligent act was overloading his truck and half believed it was failing to warn oncoming traffic . . ." *Id.*

46

The general rule thus remains that, in a case involving a single liability theory such as negligence or breach of contract, the court should submit the claims to the jury in broad form rather than granulated to individual factual allegations. *See Thota*, 366 S.W.3d at 689 (negligence); *Urista*, 211 S.W.3d at 757 (negligence); *Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 123-24 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (contract); *Rough Creek Lodge Operating, L.P. v. Double K Homes, Inc.*, 278 S.W.3d 501, 509 (Tex. App.—Eastland 2009, no pet.) (contract). Otherwise, the *Casteel* exception would swallow the rule.

2. <u>*Casteel* granulation is not required unless the alleged invalid theory was presented to the jury at trial.</u>

The typical scenario triggering *Casteel* arises when the charge injects error by instructing the jury to consider an erroneous liability theory or damages element. *See, e.g.*, *Casteel*, 22 S.W.3d at 387 (single question instructed jury on thirteen listed liability grounds, several of which were invalid); *Harris County*, 96 S.W.3d at 231-232 (damages question instructed the jury it could consider unsupported elements of damages); *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 865 (Tex. 2009) (submission of invalid theory under *Casteel* involves a "trial court's error in instructing a jury to consider erroneous matters."). That is not the situation here—the standard, broad-form jury questions at issue did not reference section 2 or suggest to the jury that it should consider

47

Defendants' breach of section 2 in determining liability or damages. App.4 at Q1, Q6. Instead, Defendants' *Casteel* argument is based on the assumption that, because the broad-form questions did not instruct the jury to *exclude* section 2, they impliedly mixed invalid and valid liability theories.

Courts have struggled with defining precisely when individual factual allegations related to a claim constitute separate liability theories that require granulation. There is no doubt, however, that *Casteel* is not triggered unless the alleged invalid issue was presented to the jury at trial. Here, there was no evidence or argument at trial regarding breach of section 2.

a. Factual allegations underlying breach of contract do not need to be granulated.

"When a plaintiff alleges that multiple instances of the same kinds of acts committed by the same defendant result in liability for the same cause of action, it is an open question as to whether the acts constitute multiple theories of liability or simply multiple factual allegations supporting a single theory of liability." *Memon v. Shaikh*, 401 S.W.3d 407, 416 (Tex. App.—Houston [14th Dist.] 2013, no pet.). Courts have come down on both sides of this issue.[12] Defendants ignore this split in authority, and instead cite only to a limited set of cases that have required *Casteel* granulation. *See* Brief at 52-55.

---

[12] LTT has been unable to identify any Third Court cases on this issue; nor did Defendants cite any.

1250216

The bulk of authority, however, agrees that *Casteel* does not require the granulation of factual issues related to a single liability theory, such as negligence or breach of contract. *See, e.g., Urista,* 211 S.W.3d at 757 ("Where, as here, the broad-form questions submitted a single liability theory (negligence) to the jury, *Casteel's* multiple-liability-theory analysis does not apply."); *Thota*, 366 S.W.3d at 681-82, 693 (plaintiff alleged five different reasons why the defendant doctor was negligent, but court concluded that the case involved only one liability theory, negligence, and held that granulation of inferential rebuttal and defensive theories was not required)[13]; *Shelby Distributions, Inc. v. Reta*, 441 S.W.3d 715, 718-19 (Tex. App.—El Paso 2014, no pet.) (*Casteel's* presumed-harm rule did not apply to a single broad-form liability question because that question involved only one liability theory—retaliatory discrimination); *Memon*, 401 S.W.3d at 416 (plaintiff

---

[13] In *Thota* and *Urista*, the Supreme Court makes clear that a negligence claim is a single liability theory under *Casteel*. The Court has not yet analyzed whether a breach of contract claim should be treated the same way, but the appellate courts that have analyzed this question agree that breach of contract is a single liability theory, like negligence. Defendants ignore these cases, and instead focus on a single decision in *Morrison*, which involved a statutory claim for adverse employment actions. *See Texas Comm'n on Human Rights v. Morrison*, 381 S.W.3d 533 (Tex. 2012) (per curiam). The Labor Code mandates, as a jurisdictional prerequisite to suit, that the plaintiff first file a charge of discrimination with the EEOC. Tex. Lab. Code §§ 21.201, 21.254. The plaintiff in *Morrison* failed to file an EEOC charge on her claim of failure to promote, but nevertheless presented evidence at trial that she was denied a promotion. The Court found error under *Casteel* where the charge asked if the defendant had taken "adverse personnel actions" without limiting the jury's consideration of the denied promotion. *Id.* at 537. The *Morrison* opinion does not explain why "negligence" is a single liability theory and "adverse personnel actions" are not, but logically the unique statutory requirements for a Labor Code cause of action are the difference. Because the statute mandates EEOC exhaustion as a jurisdictional matter, every factual allegation that could give rise to liability under the statute must be treated as an independent liability theory. Regardless, as set forth below, *Morrison* is distinguishable because denied promotion was an issue actually presented to the jury at trial.

49

had alleged defamation liability based on multiple statements; the court held that "on the facts of this case, in which each factual allegation required proof of the same elements and resulted in the same injuries, only one theory of liability was presented."); *Formosa Plastics Corp., USA v. Kajima Int'l, Inc.*, 216 S.W.3d 436, 455 (Tex. App.—Corpus Christi—Edinburg 2006, pet. granted, judg't vacated by agrt.) (rejecting defendant's argument that fraud question should have included separate answer blanks for each of the contracts at issue because "*Casteel* applies to multiple theories of liability; by contrast, the instant situation involves only one—fraud."); *Sunbridge Healthcare Corp. v. Penny*, 160 S.W.3d 230, 254 (Tex. App.—Texarkana 2005, no pet.) (case submitted under a single negligence theory did not require *Casteel* granulation); *Columbia Medical Center of Las Colinas v. Bush*, 122 S.W.3d 835, 858 (Tex. App.—Fort Worth 2003, pet. denied) (same).

In particular, two recent cases hold that breach of contract is a single liability theory that does not need to be granulated under *Casteel*. *Powell*, 356 S.W.3d at 123-124; *Rough Creek Lodge*, 278 S.W.3d at 509. In *Rough Creek* the defendant challenged submission of a contract question in broad form, claiming that it could not determine the factual basis for the jury's answer on appeal. The court of appeals disagreed, explaining:

> Unlike *Casteel*, [the plaintiff] asserted a single cause of action: *breach of contract. Merely because this required the resolution of multiple fact questions does not convert it into multiple theories of liability.*

50

Unlike *Harris County*, the jury was not instructed to consider an element of damage for which there was no evidence.

*Rough Creek*, 278 S.W.3d at 509 (emphasis added).

In *Powell*, the plaintiff alleged eleven different contract breaches. *Powell*, 356 S.W.3d at 123. The trial court submitted contract liability to the jury in broad form. On appeal, the defendant argued that several of the breach theories were invalid because they were not the cause of the alleged damages, and the charge therefore included *Casteel* error. The court of appeals disagreed because breach of contract was a single theory of liability and the trial court did not otherwise instruct the jury to consider erroneous matters. *Id.* at 124. The court also noted that, although there may have been evidence that the defendant breached the contract in multiple ways, the plaintiff "never contended that any other breach caused damages, so there was no risk that the jury might find damages based on evidence of other breaches." *Id*. at 123.

Here, like the defendants in *Rough Creek* and *Powell*, Defendants allege that the court should not have submitted broad-form contract questions to the jury, but instead should have limited the jury's consideration to particular allegations of breach. That argument ignores the case law that *Casteel* simply does not apply to single liability theories.

51

b. *Casteel* does not apply if the alleged invalid theory was not before the jury at trial.

This Court does not need to resolve the question of precisely where to draw the line between factual allegations and liability theories under *Casteel* because *Casteel* does not apply unless the allegedly invalid "liability theory" was actually presented to the jury at trial. *See Powell*, 356 S.W.3d at 123 (declining to apply *Casteel* presumed harm in a contract case when the plaintiff never contended at trial that invalid breach theories had caused damages, "so there was no risk that the jury might find damages" on that basis); *Benge v. Williams*, __S.W.3d__, No. 01-12-00578-cv, 2014 WL 6462352, at *11 (Tex. App.—Houston [1st Dist.] Nov. 18, 2014, n.p.h.) ("If one of the plaintiff's legal theories does not support liability as a matter of law and the plaintiff presented evidence to the jury on that theory that may have led the jury to answer affirmatively the broad-form liability question incorporating the invalid theory, there is a *Casteel*-type charge error.") (citing *Hawley*, 284 S.W.3d at 863-65).

*Benge* provides an excellent example of this concept. *See Benge*, 2014 WL 6462352. The plaintiff sued her surgeon for negligence in performing surgery and in failing to obtain informed consent that a resident would assist. The plaintiff did not plead informed consent, so that was an invalid liability theory. The charge asked only a broad form liability question on negligence. In analyzing whether there was *Casteel* error, the court of appeals determined that "[e]vidence regarding

52

the disclosure issue was a major theme of [plaintiff's] case and was explicitly incorporated into liability questions asked of her expert." *Id.* at *12. The court concluded that the "disclosure theory was a primary theme of the case," *Id.* at *15, and for that reason the broad form question raised a *Casteel* issue:

> The introduction of evidence admissible for multiple purposes does not in itself create a *Casteel* problem. But the broad-form negligence question here necessarily included a non-disclosure legal theory because the evidence explicitly included standard-of-care questions on informed consent.

*Id.* at *18.

*Benge* makes clear that *Casteel* is limited to cases where the plaintiff advocated an invalid liability theory at trial that could have influenced the jury's decision. For *Casteel* presumed harm to apply, "the erroneous instruction must have 'probably prevented the appellant from properly presenting the case to the court of appeals.'" *Abraham*, 2006 WL 191940, at *7 n. 8 (citing *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 227 (Tex. 2005)). But where, as here, the invalid theory was not advocated at trial, the jury could not have been misled, and the defendant could not have been harmed by the submission of a broad form question.[14]

---

[14] The presumption of harm under *Casteel* is not always a foregone conclusion; nor is the inclusion of a flawed liability theory in a broad-form question always automatically reversible under *Casteel*. *Abraham*, 2006 WL 191940, at *7 n.8. If the appeals court is "reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it" then the court may find that any error was harmless. *Id; see also Urista*, 211 S.W.3d at 757 (under traditional harm analysis, an incorrect jury instruction requires reversal only if it "was reasonably calculated

1250216

The cases Defendants cite are distinguishable on this critical basis. In each case, the invalid liability theory was prominently featured at trial. *See Morrison*, 381 S.W.3d at 537 (plaintiff presented evidence at trial that she was denied a promotion); *McFarland v. Boisseau*, 365 S.W.3d 449, 450-51 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (jury found defamation liability on eight statements listed in the charge but only two were properly before the jury); *Sand Point Ranch, Ltd. v. Smith*, 363 S.W.3d 268, 275 (Tex. App.—Corpus Christi 2012, no pet.) (two groups of plaintiffs challenged a partition order; one group did not have standing; court allowed both sets of plaintiffs to challenge the order at trial and submitted only one question that failed to differentiate between the parties); *Clear Lake City Water Authority v. Kirby Lake Dev., Ltd.*, 123 S.W.3d 735, 739-41, 748 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (only one of three contract liability theories presented at trial was valid).[15] In each case there

---

to and probably did cause the rendition of an improper judgment."). Further, there was sufficient evidence that Defendants breached sections 3, 6, and 9 of the LOI, and that those breaches resulted in harm to LTT. Viewing the record as a whole, any alleged error in the charge did not cause the rendition of an improper judgment. *See Thota*, 366 S.W.3d at 696 (where a reasonable jury could resolve conflicting evidence either way, "we presume the jury did so in favor of the prevailing party."). That is particularly true here, where LRMC did not even challenge the sufficiency of the evidence of its breach of LOI sections 3, 6, and 9.

[15] *Clear Lake* was decided before *Thota* and *Urista*, which cautioned against applying *Casteel* too broadly and held that *Casteel* does not apply in a case asserting a single liability theory. *Thota*, 366 S.W.3d at 681-82; *Urista,* 211 S.W.3d at 757. Perhaps for this reason, the court in *Clear Lake* did not analyze whether multiple theories of contract breach are independent liability theories under *Casteel*. *Id.* at 753. However, that same court later acknowledged in *Memon* that it is an "open question" whether factual allegations in support of a cause of action are "liability theories" under *Casteel*. *See Memon*, 401 S.W.3d at 416. In light of subsequent case law, *Clear Lake* is questionable authority on this issue.

was a real possibility that the jury would base its decision on an invalid theory that was actually litigated at trial, unless the charge instructed the jury not to do so. There is no such possibility here.

      c.      <u>LTT never advocated at trial that Defendants breached section 2 of the LOI.</u>

Here, the charge did not instruct the jury to consider section 2 of the LOI. Nor did LTT contend at trial that Defendants breached section 2 of the LOI, or that any breach of section 2 caused LTT damages. When asked which contract provisions LTT contended Defendants had breached, LTT's Berry answered "Sections 3, 6, [and] 9." 8RR177. Berry testified that LTT contended Defendants failed to use their best efforts in breach of section 3, and that they had used LTT's confidential and proprietary information in violation of sections 6 and 9. *Id.* There was nary a discussion of any breach of section 2.[16]

Defendants nevertheless argue that the charge was flawed because it did not limit the jury's consideration to the specific contract provisions at issue. If this is the law, then every contract case, regardless of the evidence at trial, will require granulated submission, and any defendant in a breach of contract case can cherry-pick random contract provisions, allege there was legally insufficient evidence in

---

[16] As is discussed above in section B.2.a, reference to the agreed purchase price of a terminated contract to establish value is proper and does not impermissibly seek to enforce that contract. *See Phillips*, 2015 WL 2148951 at *11. Thus, any reference to section 2 to identify the consideration agreed upon for LTT does not involve a claimed breach of section 2.

1250216

support of breach of those contract provisions, and contend that a broad-form question was therefore improper. That is not the law.

3. Defendants' proposed instruction would not have cured any alleged error and was otherwise improper.

The court properly refused Defendants' requested instruction listing the elements of a breach of contract claim. 3CR12972. That is a superfluous instruction that would have confused the jury. Further, it would not have cured any alleged *Casteel* issues.

"A trial court is afforded more discretion when submitting instructions than when submitting questions." *GJP, Inc. v. Ghosh*, 251 S.W.3d 854, 886 (Tex. App.—Austin 2008, no pet.). A trial court has great latitude and considerable discretion to determine necessary and proper jury instructions. *Id.*; *see also Abraham*, 2006 WL 191940, at *8 (citing *Louisiana-Pacific Co. v. Knighten*, 976 S.W.2d 674, 676 (Tex. 1988)). When a trial court refuses to submit an instruction, "the question on appeal is whether the request was reasonably necessary to enable the jury to render a proper verdict." *Benge*, 2014 WL 6462352, at *11. The court should not reverse unless the refusal probably caused the rendition of an improper judgment. *United Pacific Railroad Co. v. Williams*, 85 S.W.3d 162, 170 (Tex. 2002). Further, the "charge need not and should not burden the jury with surplus instructions, even if the additional instructions are correct statements of the law." *Ghosh*, 251 S.W.3d at 887-88.

56

The court did not abuse its discretion here. The instruction conflates legal questions properly determined by the court, such as whether there was a valid, enforceable contract, with the discrete factual questions properly before the jury, such as whether the defendant failed to comply with the contract terms. *See, e.g., Inimitable Group, L.P. v. Westwood Group Dev. II, Ltd.*, 264 S.W.3d 892, 899 (Tex. App.—Fort Worth 2008, no pet.) ("Whether an agreement is legally enforceable or binding is a question of law."); *Gupta v. Eastern Idaho Tumor Institute, Inc.*, 140 S.W.3d 747, 756 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) ("A trial court should not submit a pure question of law to the jury, but it may submit a question that asks the jury to resolve a factual dispute regarding a party's failure to perform."). Further, the instruction would have submitted causation and damages to the jury twice; the charge had a separate question on whether Defendants' failure to comply resulted in damages. App.4 Q6.

The jury did not need to know the elements of a breach of contract claim in order to determine whether Defendants failed to comply with the LOI; that is why the PJC frames breach of contract questions as it does. Nor would an instruction on the elements of a contract claim have directed the jury not to consider breach of section 2 of the LOI. Moreover, instructing the jury that it can find a "failure to comply" only when there is a "valid, enforceable agreement" to which the defendants were "proper parties" asks the jury to speculate on questions not

57

properly before it—without any guidance on what a "valid, enforceable contract" or a "proper party" would be.

## E. The fee award was proper.

For the reasons discussed above, this Court should affirm the judgment. Because LTT can recover on its contract claim against Defendants, this Court should affirm the fee award as well. Defendants stipulated as to the amount of the fee award.

## CONCLUSION AND PRAYER

As noted at the start of this brief, this case was well-tried, the jury's findings are well-supported, and judgment is proper. LTT respectfully prays that this Court affirm the judgment in its entirety. In the alternative, LTT prays that the Court render judgment for $790,000 in damages. In the further alternative, LTT prays that this Court remand for a new trial in the interest of justice. LTT prays for such additional relief to which it may be entitled.

58

Respectfully submitted,

**SCOTT DOUGLASS & MCCONNICO LLP**
303 Colorado Street, 24th Floor
Austin, TX  78701
(512) 495-6300
(512) 495-6399 Fax

By:  /s/ *Jane Webre*_____
      Jane M.N. Webre
      State Bar No. 21050060
      jwebre@scottdoug.com
      S. Abraham Kuczaj, III
      State Bar No. 24046249
      akuczaj@scottdoug.com
      Robyn B. Hargrove
      State Bar No. 24031859
      rhargrove@scottdoug.com

      COUNSEL FOR LTT

1250216

## CERTIFICATE OF SERVICE

I certify that the foregoing pleading was served on the following counsel of record via the electronic noticing system and e-mail, on November 20, 2015.

Jeff Cody
Barton Wayne Cox
NORTON ROSE FULBRIGHT
2200 Ross Avenue, Suite 2800
Dallas, TX  75201-2784

Joy Soloway
NORTON ROSE FULBRIGHT
1301 McKinney, Suite 5100
Houston, TX 77010-3095

Robert A. Bragalone
B. Ryan Fellman
GORDON & REES, LLP
2100 Ross Avenue, Suite 2800
Dallas, TX  75201

Jessica Z. Barger
Raffi Melkonian
Wright & Close, LLP
One Riverway, Suite 2200
Houston, TX 77056

_____/s/ *Jane Webre*_____
Jane Webre

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing instrument was prepared using Microsoft Word 2010, and that, according to its word-count function, the sections of the foregoing pleading covered by TRAP 9.4(i)(1) contain 14,370 words.

_____/s/ Jane Webre_____
Jane Webre

1250216

# APP. 1

 SURGICAL DEVELOPMENT PARTNERS

G. Edward Alexander
Direct Telephone Number: 615-550-2600 · ext 12
Cell Phone Number: 615-289-9896
Direct Telefax Number: 615-550-2601
E-Mail:
ealexander@surgicaldevelopmentpartners.co
m

John T. Prater
Direct Telephone Number: 615-550-2600 · ext 13
Cell Phone Number: 615-714-1898
Direct Telefax Number: 615-550 -2601
E-Mail:
jprater@surgicaldevelopmentpartners.com

VIA E-MAIL – September 15, 2009

Mr. Robert F. Berry
Mr. R. Keith McDonald
13706 Research Blvd., Ste 102
Austin, TX 78750
rfberryok@yahoo.com

RE:  **Letter of Intent for the Acquisition of the Lakeway Hospital Lease**

Dear Robert and Keith:

Thank you for the opportunity to re-affirm our interest in the acquisition of the lease (the "Lease") for the hospital facility currently under construction in Lakeway, Texas (the "Facility") as the initial campus for Lakeway Regional Medical Center, LLC ("LRMC") and to serve as a key satellite facility for LRMC after the main campus for LRMC is developed (the "Project"). Surgical Development Partners, LLC, ("SDP") is pleased to submit this Letter of Intent, as the agent for LRMC, to each of you (collectively, the "Principals") (each a "Party" and collectively the "Parties") for the Parties to work in good faith with each other to plan, form, develop, fund, acquire, open and operate the Project. The objective of this Binding Letter of Intent is to indicate SDP's interest in the Project and to establish the ground rules for the ongoing exchange of information between the Parties to facilitate the development of the Project and the exchange of information required for such a process to succeed. To clarify this relationship and to best protect the interests of all of the Parties, the Parties hereto agree as follows:

1.  **Discussions and Negotiation of the Project.**  Upon the execution of this Letter of Intent the Parties will enter into discussions and negotiations for a period of forty-five (45) days, which may be extended by the mutual agreement of both parties (the "Negotiation Period"), with regards to evaluating and implementing the proposed Project with one another as well

*201 Seaboard Lane, Suite 100, Franklin, TN 37067*
*Telephone: (615)550-2600  Fax: (615) 550-2601*

LTT v LRMC/SDP
No. D-1-GN-12-000983

**PX0002**

Exhibit
2
Berry
8/8/13

LTT002154
Confidential

as with any third party, as agreed to by the Parties, for the development and implementation of the Project.

2. **The Proposed Outline of the Terms of the Project.** As we have discussed the outline of the terms for the Project are as follows:

   2.1. _Acquisition of the Lease._ LRMC will assume the existing Lease between Lake Travis Transitional LTCH, LLC (or its assignee controlled by the Principals) and HCN Interra Lake Travis LTACH, LLC ("HCN") and become the tenant under the Lease. The Principals and each and every one of their respective affiliates will be relieved of all liability related to the Lease and the Facility upon the assignment of the Lease to LRMC, including, without limitation, the release of any guaranties relating to the Lease by the Principals or any of their respective affiliates, and LRMC shall ensure that all such liabilities in favor of any third parties are released in connection with the assignment of the Lease and shall indemnify and hold the Principals and their respective affiliates harmless from any and all such liabilities from and after the assignment of the Lease.

   2.2. _Reimbursement of Deposits and Costs; Assumption of Obligations._ LRMC will refund at closing of the assignment of the Lease all deposits made by the Principals and their respective affiliates and reimburse to the Principals and their respective affiliates all reasonable and documented costs that have been advanced by them to develop the Facility, including, without limitation, compensation and benefits paid to employees of the Principals and/or their respective affiliates responsible for the planning and construction of the Facility, all expenses incurred in connection with the planning and construction of the Facility, and interest expense associated with indebtedness incurred in connection with the Facility. In addition to the foregoing, LRMC shall assume all liabilities and contractual obligations of the Principals and their respective affiliates incurred with respect to the Facility (whether relating to its development or its ongoing operations following its commencement of operations). In particular and without limiting the foregoing, LRMC shall either offer employment at their current compensation levels to, or shall reimburse Principals and their respective affiliates, as applicable, for severance equal in the aggregate to six months' of such current compensation for, each of the following personnel relating to the Facility: Chief Operating Officer, Vice President of Facilities Management, Vice President of Ancillary and Support Services, Clinical Specialist (Infection Control Nurse), Vice President of Medical Affairs, and Director of Facilities Management.

   2.3. _Lump Sum Payment._ In exchange for the assignment of the Lease to LRMC, LRMC will make a single lump sum cash payment at closing to the Principals, or their designated assignee, equal to $1.5 million.

LTT002155
Confidential

3. **Required Approvals for the Project.** The above indicated terms in Section 2 will be subject to the following conditions: (i) full and formal approval by the Board of Managers of LRMC; (ii) the approval of HCN as landlord under the Lease to the assignment thereof; (iii) a reasonable due diligence process related to the feasibility of the Facility to serve as a campus for a general acute care hospital as configured or reasonably modified; (iv) the ability of LRMC to obtain appropriate funding to allow for this expansion of the operational plans for LRMC; and (v) the mutual development of definitive documents that fully reflect the intention of the Parties expressed in this Letter of Intent. The Parties agree to use their respective best efforts to satisfy each of the foregoing conditions as soon as reasonably practicable, subject to the other terms of this Letter of Intent.

4. **Earnest Money.** In consideration of the Principals' willingness to enter into this Letter of Intent and disclose Proprietary Information relating to the Lease and the Facility to SDP and LRMC, SDP shall cause LRMC to deposit as earnest money the amount of $50,000 with an escrow agent mutually acceptable to the Parties on or before the fifth day following execution of this Letter of Intent. In the event this Letter of Intent is terminated by or on behalf of LRMC for any reason, or in the event definitive agreements for the transactions contemplated herein are not executed by the parties during the Negotiation Period (unless the failure to execute one or more definitive agreements lies with or is attributable to the unreasonable delay of Principals or the Principals' unwillingness to agree to terms materially consistent with this Letter of Intent), the earnest money, including all interest thereon, shall be forfeited to Principals. If Principals terminate this Letter of Intent, or if definitive agreements for the transactions contemplated herein are not executed by the parties due to the unreasonable delay of Principals or the Principals' unwillingness to agree to terms materially consistent with this Letter of Intent, the earnest money, including all interest thereon, shall be returned to LRMC.

5. **Term.** This Letter of Intent will remain open for acceptance until September 17, 2009. After acceptance this Letter of Intent may be terminated by either Party, for any reason, with written notice to the other Party, subject to the provisions described above relating to the entitlement to the earnest money, and below related to the sharing of information gained in the negotiation and development process.

6. **Standstill and Non-Circumvention Provisions.** Each of the Parties recognizes and acknowledges that in connection with such meetings and the exchange of information to discuss the Project, all Parties will need to act in good faith and not use any knowledge gained in the Project discussion process for their own benefit and exclusive of the rights or interests of the other Party. In order to accomplish that goal, the Parties agree: (i) that Principals will not enter into negotiations with any third party for the assignment of the Lease while this Letter of Intent is in force; (ii) LRMC will not enter into negotiations with any third party for the use of any site, other then the intended LRMC main campus site, as an alternative or satellite facility while this Letter of Intent is in force; and (iii) not to share any information with third parties gained in the negotiation and development process for the

LTT002156
Confidential

Project or to independently use any proprietary information of the other Party in any discussions or negotiations regarding this Project with third parties after the acceptance of this Letter of Intent. The parties agree that these standstill provisions shall not apply to the continued work by Principals on their plans for the operation of the Facility, the continued recruitment of potential investors by Principals to be equity holders in the Principals' project, or other operational matters relating to the Facility during the term of this Letter of Intent, but no such discussions shall preclude the Principals from entering into the definitive agreements contemplated in this Letter of Intent or from consummating the transactions contemplated herein.

7. **Fees and Expenses.** Each party will bear its own expenses associated with the development of the overall strategy and the interaction of the Parties in developing the definitive terms for the agreements contemplated by this Letter of Intent.

8. **Relationship Between the Parties.** None of the provisions of this Letter of Intent are intended to create, nor shall be deemed or construed to create, any relationship between the Parties and any of the Parties' vendors or agents and any of the Parties, other than that of independent entities contracting with each other hereunder solely for the purpose of providing the services described in this Letter of Intent as independent contractors, and otherwise maintaining and carrying out the provisions of this Letter of Intent. None of the Parties nor any of their respective agents or employees shall be construed to be the agent, employer, employee, partner, joint venturer, or the representative of the other parties hereto, for any purpose of any kind or nature whatsoever. Both Parties agree to hold the other harmless from third-party liability resulting from acts of any Party.

9. **Confidentiality.** The Parties desire to assure the mutual confidential status of any information which may be disclosed to or from any Party in the evaluation of this Project and the indicated approach to the Project:

   9.1. Proprietary Information. Except as provided in Subsection 9.7., below, all information disclosed by any Party or its Representatives at any time to any other Party or its Representatives in connection with the Project in any manner shall be deemed "Proprietary Information." The term "Representative(s)" means, in the case of LRMC or SDP, any director, officer, employee, member, shareholder, or agent of LRMC or SDP engaged in the evaluation of the Project, and in the case of Principals, Robert F. Berry and R. Keith McDonald.

   9.2. Permissible Use. Each Party that receives Proprietary Information (referred to as the "Receiving Party") shall use the Proprietary Information received from any other Party (referred to as the "Disclosing Party") solely to evaluate the feasibility of the Project or similar transactions between the Parties. No other rights are implied or granted under this Letter of Intent.

LTT002157
Confidential

9.3.  Reproduction. Proprietary Information received shall not be reproduced in any form except for internal use of the Receiving Party and its Representatives and only for the express purpose of evaluating the Project.

9.4.  Nondisclosure. The Receiving Party shall use all reasonable efforts to protect the Proprietary Information received with the same degree of care used to protect its own Proprietary Information from unauthorized use or disclosure, except that such Proprietary Information may be used or disclosed to the Receiving Party's Representatives as may be reasonably required to evaluate the Project.

9.5.  Ownership of Information. All Proprietary Information, unless otherwise specified in writing, shall remain the property of the Disclosing Party and promptly upon request of either Party shall be returned to the Disclosing Party (including all whole or partial copies thereof and any written notes made regarding the Proprietary Information).

9.6.  No License or Interest. No rights or obligations other than those expressly recited herein are to be implied. No license is granted to the Receiving Party or otherwise implied, by estoppel or otherwise, with respect to any property or right of Disclosing Party, presently existing or acquired in the future, or for any use of or interest in the Proprietary Information except such use expressly contemplated by this Letter of Intent.

9.7.  Exclusions. It is understood that the term "Proprietary Information" does not include Information which:

(a.)  is now or hereafter in the public domain through no fault of the Receiving Party;

(b.)  prior to disclosure hereunder, is properly within the rightful possession of the Receiving Party;

(c.)  is lawfully received from a third party with no restriction on further disclosure; or

(d.)  is obligated to be produced under applicable law or order of a court of competent jurisdiction, unless made the subject of a confidentiality agreement or protective order.

## 10. Miscellaneous.

10.1.  Remedies. Based on the subject matter of this Letter of Intent and the mutual obligations and duties indicated herein material and irreparable harm shall be presumed, if any Party to this Letter of Intent breaches any provision of this Letter of Intent. The Parties agree, that in the case of the breach of any of the non-circumvention

**LTT002158**
**Confidential**

or confidentiality provisions of this Letter of Intent, the non-breaching Party will have the right to request that any court of competent jurisdiction shall immediately enjoin the Party in breach in addition to that Party being entitled to all other rights and remedies which the Party may have at law or in equity.

10.2.    Compelled Disclosure.   In the event a Party, any of its Representatives, or anyone to whom any Party transmits the Proprietary Information, becomes legally compelled to disclose any of the Proprietary Information, prior to such disclosure such Party will provide the owner of the Proprietary Information with advance written notice and a copy of the documents and information relevant to such legal action, so the owner of the Proprietary Information may seek a protective order or other appropriate remedy to protect its interests in the Proprietary Information, and the compelled Party shall furnish only that portion of the requested Proprietary Information that the compelled Party is advised by a written opinion of counsel is legally required.

10.3.    Entire Agreement.   There are no other understandings, agreements, or representations, express or implied, between the Parties, not herein specified until such time as definitive agreements for proposals and letters of understanding can be developed and agreed to by the Parties for any individual Project. This Letter of Intent may not be amended except in a writing executed by all Parties.

10.4.    Assignment. This Letter of Intent may not be assigned without the express written consent of all of the other Parties.

10.5.    Governing Law.   This Letter of Intent and all transactions contemplated by this Letter of Intent shall be governed by the laws of the State of Texas.

10.6.    Counterparts. This Letter of Intent may be executed in any number of copies and by the different Parties hereto on separate counterparts.   Each counterpart shall be deemed an original, but all counterparts together shall constitute one and the same instrument.   The persons executing this Letter of Intent personally represent and warrant that they have been duly authorized to do so by their respective Party and that, upon full execution hereof, this Letter of Intent shall be a binding obligation of said Party.

10.7.    Termination.   Termination of this Letter of Intent shall not relieve any of the Parties from the obligations imposed by Section 6 and Section 9 above, with respect to Standstill, Non-Circumvention and/or Proprietary Information exchanged between the Parties, or as it relates to the terms, conditions, plans or discussions regarding the Project.

11. **ACCEPTANCE** - If Principals are in agreement with the objectives indicated in Section 2 and the conditions indicated in Section 3 of this Letter of Intent and the terms and conditions contained herein, please sign the RETURN COPY of this Letter of Intent and

**LTT002159**
**Confidential**

return it to SDP. The terms of this Proposal are valid until 5:00 PM, Central Time, September 17, 2009 and may be accepted as indicated above.

We look forward to our future meetings and the success of the Project which we can accomplish through our mutual efforts.

Sincerely,

**SURGICAL DEVELOPMENT PARTNERS, LLC**

G. Edward Alexander, President and CEO

**Accepted this ___ day of September, 2009 and effective September ___, 2009.**

Robert F. Berry

R. Keith McDonald

LTT002160
Confidential

# APP. 2

# Surgical Development Partners, LLC

# AND

# Lake Travis Transitional LTCH, LLC

# CONFIDENTIALITY AGREEMENT

**THIS CONFIDENTIALITY AGREEMENT** ("Agreement") is made this 11th day of May, 2009, to be effective May 11, 2009 by and between Surgical Development Partners, LLC an Ohio limited liability company ("SDP") and Lake Travis Transitional LTCH, LLC, a Texas limited liability company ("LTT ").

## WITNESSETH

WHEREAS, SDP has an interest in a potential development and/or management agreement opportunity as presented by LTT and will have access to, certain Confidential Information regarding these opportunities; and

WHEREAS, LTT is interested in making the above indicated opportunities available to SDP and will allow SDP to have access to, certain Confidential Information regarding LTT's business; and

WHEREAS, SDP and LTT desire to memorialize their understandings regarding SDP's disclosure and use of Confidential Information.

NOW, THEREFORE, In consideration of the foregoing premises in this Agreement, the parties agree as follows:

1. Confidential Information. LTT may furnish SDP with certain confidential, non-public and/or proprietary information concerning a certain Project in Texas (the "Project"). SDP may furnish LTT with proprietary information concerning its business. All information concerning the Project shall be held by SDP in confidence in accordance with this agreement. All business information concerning LTT's business shall be held by SDP in

LTT v LRMC/SDP
No. D-1-GN-12-000983

exhibitsticker.com

PX0004

Exhibit
4
Berry
8/8/13

confidence in accordance with this Agreement. All information concerning the Project and LTT's business shall hereafter be referred to as the "Confidential Information".

2. Use of Confidential Information. The parties hereto agree to use Confidential Information only for informational purposes to evaluate participation in the Project. Both parties agree not to disclose Confidential Information to any other person or entity except upon the written consent of the other party. Both parties agree that, as set forth above, neither it nor its employees, agents, or business or professional associates will disclose or use any Confidential Information in any matter whatsoever.

3. Return of Confidential Information. All Confidential Information is to remain the sole property of each respective party. All Confidential Information furnished in documentary form and any copies thereof shall be returned to each respective party immediately upon its request.

4. Entire Agreement: Invalidity. This agreement contains the full and complete understanding of the parties with respect to the subject matter hereof. It supercedes all prior representations and understandings whether oral or written. In the event that any provision herein is found invalid or unenforceable pursuant to judicial decree or discussion, any such provision or obligation shall be deemed and construed to extend only to the maximum permitted by law and the remainder of this agreement shall remain valid and enforceable according to its terms.

5. Equitable Relief. Because of the unique and proprietary nature of the Confidential Information, it is understood and agreed that remedies at law for breach by a party of its obligations under this agreement will be inadequate and either party shall, in the event of such a breach, be entitled to equitable relief, (including without limitation, injunctive relief and specific performance) without any requirements to post bond as a condition for such relief, in addition to all remedies under this agreement or available at law.

6. Legal Fees. The prevailing party and any action or proceeding brought to enforce the provisions of this agreement shall be entitled to recover its reasonable legal costs and expenses incurred in such action or proceeding, including but not limited to, any legal costs and expenses incurred to enforce any judgments rendered on this agreement. The provision regarding recovery of legal costs shall not be merged into any judgment on this agreement.

7. No Rights. Nothing in this agreement shall give either party any right, title, license, or interest, whatever in or to the Confidential Information (which shall remain at all times the property of each respective party) or in or to any existing patents, know how, inventions or other intellectual property of each respective party.

8. Non-Assignability. The rights and obligations of the parties under this agreement may not be assigned.

9. <u>Amendment and Governing Law</u>. This agreement can only be amended by subsequent written agreement between the parties. This agreement will be governed by the laws of the state of Ohio and the parties agree that the exclusive jurisdiction for any disagreement, dispute, claim, or matter arising hereunder shall be in the courts of the State of Ohio, or the United States located in Summit County, Ohio.

IN WITNESS WHEREOF, the parties have executed this agreement as of the date above written.

**Surgical Development Partners, LLC**


G. Edward Alexander, its President



**LTT**


Robert F. Berry, its Managing Member

# APP. 3

Filed in The District Court
of Travis County, Texas

OCT 17 2014 RT

At_____7:3o____M.
Amalia Rodriguez-Mendoza, Clerk

CAUSE NO. D-1-GN-12-000983

| | | |
|---|---|---|
| LAKE TRAVIS TRANSITIONAL LTCH, | § | IN THE DISTRICT COURT OF |
| LLC n/k/a LAKE TRAVIS SPECIALTY | § | |
| HOSPITAL, LLC, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| LAKEWAY REGIONAL MEDICAL | § | |
| CENTER, LLC, SURGICAL | § | |
| DEVELOPMENT PARTNERS, LLC, | § | |
| BRENNAN, MANNA & DIAMOND, LLC, | § | |
| AND FRANK T. SOSSI, | § | 345th JUDICIAL DISTRICT |

## JUDGMENT

On August 11, 2014, this cause came on to be heard. Plaintiff Lake Travis Transitional LTCH, LLC n/k/a Lake Travis Specialty Hospital, LLC ("Plaintiff" or "LTT"), appeared in person and by attorney of record and announced ready for trial. Defendant Lakeway Regional Medical Center, LLC ("LRMC") and Defendant Surgical Development Partners, LLC ("SDP") (collectively, "Defendants" and each a "Defendant"), appeared in person and by their attorney of record and announced ready for trial. A jury having been previously demanded, a jury was duly empanelled and the case proceeded to trial.

The jury heard the witnesses and the presentation of evidence. At the conclusion of the evidence, the Court submitted the questions of fact in the case to the jury. The charge of the court and the verdict of the jury are incorporated by reference herein for all purposes. On August 28, 2014, the jury returned a verdict to the Court. Because it appears to the Court that the verdict of the jury was for Plaintiff LTT and against

1138876

Defendants SDP and LRMC, judgment should be rendered on the verdict in favor of the Plaintiff LTT and against the Defendants SDP and LRMC.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Plaintiff LTT, in respect to its breach of contract claim, have and recover actual, past damages from Defendants SDP and LRMC, jointly and severally, in the amount of $7,900,000.00, as well as prejudgment interest on that amount at an annual rate of five percent (5.0%). As of October 13, 2014, prejudgment interest on that amount, calculated as simple interest based on the date this case was filed on April 3, 2012, totals $998,863.01, which amount shall increase by $1,082.19 per day until the date this judgment is signed.

The Court finds that the parties have stipulated that the amount of reasonable attorney fees incurred by Plaintiff LTT in the prosecution of its breach of contract claim against Defendants SDP and LRMC is $2,000,000.00. IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Plaintiff LTT have and recover from Defendants SDP and LRMC, jointly and severally, reasonable attorneys' fees incurred in the prosecution of LTT's breach of contract claim in the sum of $2,000,000.00 pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all costs of court incurred by Plaintiff LTT in this matter are adjudged against and shall be recovered, jointly and severally, from Defendants SDP and LRMC.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiff LTT have judgment against Defendants SDP and LRMC, and that the total amount of

2

1138876

judgment for Plaintiff LTT against Defendants SDP and LRMC, jointly and severally, shall be as follows: actual damages in the sum of $7,900,000.00; plus prejudgment interest on that sum as set forth above; plus attorneys' fees in the stipulated amount of $2,000,000.00; plus costs of court; plus post-judgment interest on the sum total of each of the foregoing, at an annual rate of five percent (5.0%), compounded annually, from the date this judgment is rendered until paid.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all writs and processes for the enforcement and collection of this judgment or the costs of court shall issue as necessary.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED by the Court that the relief specified above is hereby granted and, as to all parties and issues in this case, all relief not specifically granted herein is expressly denied. This judgment is final, disposes of all claims and parties, and is appealable.

SIGNED on October _____ 2014.

_____
HONORABLE LORA J. LIVINGSTON
PRESIDING JUDGE

3

1138876

# APP. 4

ORIGINAL

## CAUSE NO. D-1-GN-12-000983

| | | |
|---|---|---|
| **LAKE TRAVIS TRANSITIONAL LTCH,** | § | **IN THE DISTRICT COURT OF** |
| **LLC n/k/a LAKE TRAVIS SPECIALTY** | § | |
| **HOSPITAL, LLC,** | § | |
| | § | |
| **v.** | § | **TRAVIS COUNTY, T E X A S** |
| | § | |
| **LAKEWAY REGIONAL MEDICAL** | § | |
| **CENTER, LLC AND SURGICAL** | § | |
| **DEVELOPMENT PARTNERS, LLC** | § | **345TH JUDICIAL DISTRICT** |

## CHARGE OF THE COURT

LADIES AND GENTLEMEN OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your cell phone or any other electronic device during your deliberations for any reason.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the bailiff when you are not deliberating. The bailiff will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

Here are the instructions for answering the questions:

1.  Do not let bias, prejudice or sympathy play any part in your decision.

Charge of the Court
Page 1 Filed in The District Court
of Travis County, Texas

AUG 27 2014 **RT**
At_____1:50 P____M.
Amalia Rodriguez-Mendoza, Clerk

Filed in The District Court
of Travis County, Texas

AUG 28 2014 **RT**
At_____12:20 P___M.
Amalia Rodriguez-Mendoza, Clerk

12997

2.      Base your answers only on what was presented in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not presented in the courtroom.

3.      You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4.      If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5.      All the questions and answers are important. No one should say that any question or answer is not important.

6.      Answer "Yes" or "No" to all questions unless you are told otherwise. A "Yes" answer must be based on a preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "Yes" or "No," your answer must be based on a preponderance of the evidence unless you are told otherwise.

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "Yes" answer, then answer "No." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7.      Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8.      Do not answer questions by drawing straws or by any method of chance.

9.      Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10.      Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11.      Unless otherwise instructed, the answers to the questions must be based on the decision of at least 10 of the 12 jurors. The same 10 jurors must agree on every answer. Do not agree to be bound by a vote of anything less than 10 jurors, even if it would be a majority.

---

Charge of the Court
Page 2

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

## Definitions

"LTT" means Lake Travis Transitional LTCH, LLC n/k/a Lake Travis Specialty Hospital, LLC.

"LRMC" means Lakeway Regional Medical Center, LLC.

"SDP" means Surgical Development Partners, LLC.

"Letter of Intent" means the letter agreement between SDP and LTT dated September 15, 2009.

Charge of the Court
Page 3

## QUESTION NO. 1:

Did SDP and/or LRMC fail to comply with the Letter of Intent?

Answer "Yes" or "No" for each of the following:

a.    LRMC    _yes_

b.    SDP      _yes_

If you answered "Yes" to any subpart of Question No. 1 then answer the corresponding subpart of the following question. Otherwise, do not answer the following question.

## QUESTION NO. 2:

Was LRMC's and SDP's failure to comply excused?

Failure to comply by LRMC and/or SDP is excused by LTT's previous failure to comply with a material obligation of the Letter of Intent.

A failure to comply must be material. The circumstances to consider in determining whether a failure to comply is material include:

1. the extent to which the injured party will be deprived of the benefit which it reasonably expected;

2. the extent to which the injured party can be adequately compensated for the part of that benefit of which it will be deprived;

3. the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

4. the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account the circumstances including any reasonable assurances;

5. the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Failure to comply by LRMC and/or SDP is excused if the following circumstances occurred:

1. LTT

   a. by words or conduct made a false representation or concealed material facts, and

   b. with knowledge of the facts or with knowledge or information that would lead a reasonable person to discover the facts, and

   c. with the intention that LRMC and/or SDP would rely on the false representation or concealment in acting or deciding not to act; and

Charge of the Court
Page 5

2.    LRMC and/or SDP

    a.    did not know and had no means of knowing the real facts; and

    b.    relied to its detriment on the false representation or concealment of material facts.

Answer "Yes" or "No" for each of the following:

a.    LRMC   _No_

b.    SDP     _No_

## QUESTION NO. 3:

Did LRMC and/or SDP make a negligent misrepresentation on which LTT justifiably relied?

Negligent misrepresentation occurs when—

1.  a party makes a representation in the course of his business or in a transaction in which he has a pecuniary interest, and

2.  the representation supplies false information for the guidance of others in their business, and

3.  the party making the representation did not exercise reasonable care or competence in obtaining or communicating the information.

Answer "Yes" or "No" for each of the following:

a.  LRMC _____no_____

b.  SDP _____no_____

If you answered "Yes" to any subpart of Question No. 3 then answer the corresponding subpart of the following question. Otherwise, do not answer the following question.

## QUESTION NO. 4:

By what date should LTT, in the exercise of reasonable diligence, have discovered the negligent misrepresentation of LRMC and/or SDP?

Answer with a date in the blank below for each of the following:

a.     LRMC  _____

b.     SDP    _____

**Charge of the Court**
**Page 8**

If you answered "Yes" to both subparts of Question No. 3 then answer the following question. Otherwise, do not answer the following question.

Assign percentages of responsibility only to those you found cause or contributed to cause LTT's damages. The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The percentage of responsibility attributable to any one is not necessarily measure by the number of acts or omissions found.

## QUESTION NO. 5:

For each party you found caused or contributed to cause the damages to LTT, find the percentage of responsibility attributable to each:

a.    LRMC   _____ %

b.    SDP   _____ %

    Total   \_\_\_\_100\_\_\_\_ %

**Charge of the Court**
**Page 9**

If you answered "Yes" to any subpart of Question No. 1, and "No" to the corresponding subpart of Question No. 2, then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 6:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate LTT for its damages, if any, that resulted from LRMC and/or SDP's failure to comply with the Letter of Intent?

Consider the following elements of damages, if any, and none other. You shall not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any.

Do not add any amount for interest on damages, if any.

Do not include in your answer any amount that you find LTT could have avoided by the exercise of reasonable care.

Answer separately in dollars and cents for damages, if any.

1. The loss in fair market value of LTT's confidential information that was a natural, probable, and foreseeable consequence of LRMC and/or SDP's failure to comply with the Letter of Intent.

   Answer: $790,000

2. LTT's lost profits that were a natural, probable, and foreseeable consequence of LRMC and/or SDP's failure to comply with the Letter of Intent.

   Answer: 0

3. The loss in fair market value of LTT that was a natural, probable, and foreseeable consequence of LRMC and/or SDP's failure to comply with the Letter of Intent.

   Answer: $7,900,000

Charge of the Court
Page 10

If you answered "Yes" to any subpart of Question No. 3, then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 7:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate LTT for its damages, if any, that were proximately caused by the negligent misrepresentation?

"Proximate cause" means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

Consider the following elements of damages, if any, and none other. You shall not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not add any amount for interest on past damages, if any.

Do not include in your answer any amount that you find LTT could have avoided by the exercise of reasonable care.

Answer separately in dollars and cents for damages, if any.

1.  The difference, if any, between the value of what LTT received in the transaction and the value given.

    Answer: _____

2.  The economic loss, if any, LTT otherwise suffered in the past as a consequence of LTT's reliance on the misrepresentation.

    Answer: _____

**Charge of the Court**
**Page 11**

**Presiding Juror:**

1.      When you go into the jury room to answer these questions, the first thing you will need to do is choose a presiding juror.

2.      The presiding juror has these duties:

a.  Have the complete charge read aloud if it will be helpful to your deliberations.

b.  Preside over your deliberations. This means the presiding juror will manage the discussions and see that you follow these instructions.

c.  Give written questions or comments to the bailiff who will give them to the judge.

d.  Write down the answers you agree on.

e.  Get the signatures for the verdict certificate.

f.  Notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

**Instruction for Signing the Verdict Certificate:**

1.      You may answer the questions on a vote of 10 jurors. The same 10 jurors must agree on every answer in the charge. This means you may not have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another.

2.      If 10 jurors agree on every answer, those 10 jurors sign the verdict.

If 11 jurors agree on every answer, those 11 jurors sign the verdict.

If all 12 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3.      All jurors should deliberate on every question. You may end up with all 12 of you agreeing on some answers, while only 10 or 11 of you agree on other answers. But when you sign the verdict, only those 10 who agree on every answer will sign the verdict.

_____
JUDGE PRESIDING    8-27-14

Charge of the Court
Page 12

# VERDICT CERTIFICATE

Check one:

_____ Our verdict is unanimous. All 12 of us have agreed to each and every answer. The presiding juror has signed the certificate for all 12 of us.

_____        _____
Signature of Presiding Juror                Printed Name of Presiding Juror

✓ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

_____ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

| SIGNATURE | PRINTED NAME |
|---|---|
| 1. | Victoria Wiesen |
| 2. | Eileen McGinnis |
| 3. | Deborah J. Pesek |
| 4. | Sabrina Lenee Hardcastle |
| 5. | ROBERT D BLACKARD, III |
| 6. | Meghan Thomson |
| 7. | Scott Hambleton |
| 8. | Peri S. King |
| 9. | Amanda Mullins |
| 10. | Seyda Okcu |
| 11. | Lulae Lepiz |
| 12. | |

Charge of the Court
Page 13

# APP. 5

**From:** Frank T. Sossi
**Sent:** Monday, May 10, 2010 5:05 PM
**To:** Deen, Robert V; Jones, Jeffrey; 'ealexander@surgicaldevelopmentpartners.com'
**CC:** 'Samuel J. DeMaio, M.D., F.A.C.C.'; Brad Daniel; Frank T. Sossi
**Subject:** Questions on Lake Travis Transitional Medical Center

```
LRMC - HUD
Lakeway Hospital Issues
May 10, 2010
============================
```

Bob:

Jeff sent along your questions on the facility behind the post office and I have indicated my response, in italics, below:

```
============================
```

Jeff,

We made an effort to talk with the primary competitors, HCA and Ascension Health. We did not talk with Westlake because it had such a small % of the Lakeway Market Share (2.5%).

*Bob, Westlake is the facility that Sam DeMaio helped start in 2005. It is a 23 bed (21 med/surg - 2 ICU) facility which has limited capacity and it was the original plan of Lakeway to be the expansion of Westlake to provide a true acute care service to the Lakeway community. For the most part the Westlake facility is focused on orthopaedic practices and has limited general use.*

The writer indicates that a new Lakeway Hospital, built with all private funds, will be opening in a few months and will be in direct (acute care general hospital) competition with the Lakeway Regional Medical Center. project guaranteed project.

*The facility behind the post-office was designed as an LTAC, which missed the moratorium dates and has recently been discussed as a potential acute care. When we became aware of the missed deadline for LTAC status we investigated the LTAC facility to review the potential impact on LRMC and to see if we could use the facility as a "jump start" for licensing and Medicare Certification as LRMC was being built. To date we are not aware of any formal request to the City of Lakeway for a zoning change or the needed parkng, traffic or other impact studies that would be required for the conversion process. Please see the specific comments under your list.*

The writer indicates that Lakeway will clearly not be "underserved" because of the creation of this new hospital behind the Post Office.

*Lakeway is underserved and this "LTAC" facility will not change that in a material manner.*

Anything you can tell me about the Hospital will be helpful:

1. Is it really an acute care hospital?

*It was designed as an LTAC with 2 OR's in the basement. The structure is very small and has numerous code issues related to the construction and design. It does not have adequate parking and any conversion from what was essentially a residential facility to a true acute care will cost a great deal of money. The 46 bed level would be very difficult to expand without changing the entire nature of the development. The site is not really on RR 620 (small piece touches RR 620) and is not very accessible. At present the ONLY zoning for a hospital under the Lakeway Ordinance is the MMA zoning for the LRMC facility. Any attempt to re-zone this parcel as a "hospital" instead of a residential facility will be challenged. As indicated at our meetings when the questions related to any other suitable sites for LRMC were raised with the City of Lakeway the answer was that ONLY the LRMC site had proper zoning. We do not believe the City of Lakeway has been approached with any*



Sossi

EXHIBIT NO. 180

SDP0008121

LTT v LRMC/SDP
No. D-1-GN-12-000983

PX0180

*propsed change from the "residential facility plan".*

2. What is the name?

*The name has been Lake Travis Transitional Medical Center*

3. What is the history on its development?

*The facility has been developed by a JV between Interra and Healthcare REIT out of Toledo Ohio. The facility was designed as an LTAC hospital. The operator is out of Oklahoma and has no physician support.*

4. Who owns it?

*The Interra, Healthcare REIT JV*

5. How big is it?

*Indicated to be 46 beds and 2 small OR's. Limited imaging and major design issue to be an acute care.*

6. What financing does it have?

*It was to be structured as a 100% interest only lease. We estimated annual lease cost to be approximately $3.5M – which appears to be prohibitive for the facility.*

7. Is it really likely to be open this summer?

*We do not believe so – no operator on the horizon – no staff – just starting to shop it.*

8. What medical staff does it have?

*None that we are aware of – there was no list of interested physicians in the facility – some discussion of a group that may have an interest in a free-standing ASC on the campus.*

*Our issue with the facility was the ability to work out all the design issues, the need for major retro fits to get it to open, the lack of physician interest for the facility, the zoning issues to allow the conversion to acute care status and what to do with the facility when LRMC opens. The costs and technical problems of conversion made the facility inappropriate to help LRMC or to be able to succeed as a separate facility.*

*Please let me know if you have any other questions.*

*Frank*

Thanks,

Bob

Robert V. Deen, FACHE
Senior Account Executive
U.S. Department of Housing and Urban Development
Office of Healthcare Programs
801 Cherry Street, Burnett Plaza
25th Floor, Unit 45
Fort Worth, Texas 76102
E-Mail – Robert.V.Deen@HUD.Gov
Office – 817-978-5406
Cell – 214-205-5239
Fax – 817-978-5431

SDP0008122

-----Original Message-----
From: Jones, Jeffrey [mailto:JJones@walkerdunlop.com]
Sent: Monday, May 10, 2010 9:41 AM
To: 'ealexander@surgicaldevelopmentpartners.com'; Frank T. Sossi
Subject: Fw: LRMC


----- Original Message -----
From: Deen, Robert V <Robert.V.Deen@hud.gov>
To: Jones, Jeffrey
Sent: Mon May 10 09:35:25 2010
Subject: RE: LRMC

Jeff,

We made an effort to talk with the primary competitors, HCA and Ascension Health. We did not talk with Westlake because it had such a small % of the Lakeway Market Share (2.5%).

The writer indicates that a new Lakeway Hospital, built with all private funds, will be opening in a few months and will be in direct (acute care general hospital) competition with the Lakeway Regional Medical Center. project guaranteed project.

The writer indicates that Lakeway will clearly not be "underserved" because of the creation of this new hospital behind the Post Office.

Anything you can tell me about the Hospital will be helpful::
1.  Is it really an acute care hospital?
2.  What is the name?
3. What is the history on its development?
4.  Who owns it?
5.  How big is it?
6.  What financing does it have?
7.  Is it really likely to be open this summer?
8.  What medical staff does it have?

Thanks,

Bob

Robert V. Deen, FACHE
Senior Account Executive
U.S. Department of Housing and Urban Development
Office of Healthcare Programs
801 Cherry Street, Burnett Plaza
25th Floor, Unit 45
Fort Worth, Texas 76102
E-Mail - Robert.V.Deen@HUD.Gov
Office - 817-978-5406
Cell - 214-205-5239
Fax - 817-978-5431

-----Original Message-----
From: Jones, Jeffrey [mailto:JJones@walkerdunlop.com]
Sent: Monday, May 10, 2010 9:04 AM
To: Deen, Robert V
Subject: LRMC

Bob,

Didn't ya'll also attempt to talk to the surrounding hospitals during the due diligence

SDP0008123

period and if this guy had an issue like this, why would he have not brought it up then?

http://web.walkerdunlop.com/wd/disclaimer/

http://web.walkerdunlop.com/wd/disclaimer

| Frank T. Sossi<br>Brennan, Manna & Diamond, LLC.<br>75 E. Market Street<br>Akron, Ohio 44308<br><br>Direct Dial: 330-253-1804<br>Facsimile: 330-253-1813<br>E-Mail: FTSossi@bmdllc.com | **Notice Regarding Circular 230—Regulations Governing the Practice of Attorneys Before the Internal Revenue Service**<br><br>*For purposes of Circular 230 and unless expressly stated otherwise above, nothing contained in this message was intended or written to be used or may be relied upon or used by any taxpayer for the purpose of avoiding penalties that may be imposed on the taxpayer under the Internal Revenue Code of 1986, as amended.* |
| --- | --- |

SDP0008124

# APP. 6

************** -COMM. JOURNAL- ******************* DATE JUN-21-2010 ***** TIME 12:02 *********

MODE = MEMORY TRANSMISSION          START=JUN-21 12:00     END=JUN-21 12:02

FILE NO.=652

STN    COMM.   ONE-TOUCH/   STATION NAME/TEL NO.              PAGES    DURATION
NO.            ABBR NO.

001    OK      &            912024016431                      004/004  00:01:22

                                                  -BRENNAN MANNA DIAMOND LLC-

************************************* -330 253 1977  - ***** -   330 253 1977- *********



# BRENNAN, MANNA & DIAMOND, LLC

ATTORNEYS & COUNSELORS AT LAW
The Carnegie Building, 75 East Market Street
Akron, Ohio 44308
www.bmdllc.com

Direct Dial: 330-253.1804
Facsimile: 330-253.1813
E-Mail: ftsossi@BMDLLC.com

## FAX COVER SHEET

From:  Frank T. Sossi
Date:  Monday, June 21, 2010


To:  HUD Office of Litigation

Attn:  Mr. Bill Lane & Ms. Perrin Wright

Fax Number: 1-202-401-6431

Number of pages including cover page:   4


Please notify Jackie Tengea at (330) 253-5060 ext. 105 if not received properly.
Our 24-hour automatic fax number is (330) 253-1977.

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS PRIVILEGED AND CONFIDENTIAL
INFORMATION INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF
THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED
THAT ANY DISSEMINATION, DISTRIBUTION OR COPY OF THIS COMMUNICATION IS STRICTLY
PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY
NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE
ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU

Exhibit
136
DeMaio

LTT v LRMC/SDP
No. D-1-GN-12-000983

PX0136

CONFIDENTIAL

SDP0008214

# BRENNAN, MANNA & DIAMOND
## ATTORNEYS & COUNSELORS AT LAW

| BONITA SPRINGS OFFICE | AKRON OFFICE | JACKSONVILLE OFFICE |
|---|---|---|
| 3301 Bonita Beach Road, Suite 100 | 75 East Market Street | 800 West Monroe Street |
| Bonita Springs, Florida 34134 | Akron, Ohio 44308 | Jacksonville, Florida 32202 |
| Telephone 239-992-6578 | Telephone 330-253-5060 | Telephone 904-366-1500 |
| Facsimile 239-992-9328 | Facsimile 330-253-1977 | Facsimile 904-366-1501 |

**Frank T. Sossi**
Direct Telephone: 330-253-1804
Direct Telefax: 330-253-1813
E-Mail: ftsossi@bmdllc.com

June 21, 2010

**VIA FACSIMILE: (202) 401-6431**
HUD Office of Litigation
Mr. Bill Lane – 202-402-7528
Ms. Perrin Wright – 202-402-3229

RE: **Lakeway Regional Medical Center, Lakeway, Texas – Letter regarding Lakeway Transitional Medical Center**

Mr. Lane and Ms. Wright:

I apologize for the fax from my assistant – I am out of the office today, but can be reached by cell phone at 330-805-5812.

As to the letter from June 11, 2010 that was faxed to me on Friday, June 18, 2010 we have taken the following actions and follow ups:

1. We have contacted the City of Lakeway and they have provided the attached letter. As indicated in the letter the City has been told the Transitional Medical Center was to be a long term acute care hospital and has not been qualified in the City for general acute care services. Any modification as needed to provide those services instead of "long term acute care services" have not been vetted by the City and to date there are no definitive plans for the conversion that have been approved by the City.

2. I have called Health Care REIT ("HCN") the public company out of Toledo Ohio who is the owner of the land for the Transitional Medical Center. Late Friday I spoke to their general counsel who indicated they were not aware of the letter that was sent. They are the "owner" of the land and the letter is written by the purported "tenant" for the property. As I indicated in our call on Friday we had tried to work with Transitional on some type of conversion plan for the facility to acute care status but were unable to determine a conversion process that would allow for an effective use for the facility for

CONFIDENTIAL

SDP0008215

general acute care services without conversion costs that would make the project cost prohibitive.

3. The existence of the plans for the Transitional Medical Center were discussed in detail with the HUD Client Service Team and the facility as planned would not appear to meet the general acute care needs for the Lakeway Community. The facility has limited parking, the facility needs to be converted from "residential care" to acute care services, the facility requires numerous upgrades and modification to meet Texas licensing standards for providing true acute care services and even if qualified would not meet the indicated needs of the community. Our feasibility study clearly indicated a need for well over the initial 104 beds for the LRMC project and the needed capacity for the community is well in excess of both facilities. The need for the LRMC project has been demonstrated and the purported availability of a limited number of beds, in a yet to be approved conversion of the Transitional Medical Center, does not change that need.

It is our view that an appropriate due diligence process was followed by HUD for the LRMC Project and we expect HUD to defend the decision to issue the Guarantee. There was no lack of lack of due diligence related to the approval process, there demonstrated need for the LRMC capacity with or without the conversion of Transitional, the conversion of Transition is NOT an approved process at this time and the feasibility of such a conversion is not a fact at this time. The city and community need and expect the LRMC project to continue and be completed. The "competitive issues" of the LRMC facility have been known to the Transitional facility nearly since the inception of the plans to build the Transitional facility. In fact, as a long term acute care facility, as planned, the existence of the LRMC project is in fact a complementary project for the facility. The purported transition to acute care services is a relatively recent consideration and is based on an inability of the Transitional facility to meet the requirements for qualification under the Moratorium for Long Term Acute Care facilities.

Please let me know the status of your inquiry into this matter and let us know how we can be of assistance as you move forward to defend this issue.

Very truly yours,

Frank T. Sossi/jnt

FTS/jnt
/enclosure

CONFIDENTIAL

SDP0008216

June 18, 2010

Dr. Sam DeMaio

Chairman of the Board

Lakeway Regional Medical Center

Dear Dr. DeMaio,

Thank you for sending me a copy of the letter from Abe Kuczaj attorney for the Lake Travis Transitional Medical Center to Roger Miller, U.S. Department of Housing and Urban Development, regarding the Section 242 HUD Guaranty of the loan to the Lakeway Regional Medical Center dated June 11, 2010.

This letter asserts that the Lake Travis Transitional Medical Center "is slated to open in the fall of 2010" and that "Lake Travis is an acute care hospital". Finally, the letter asserts that the Lakeway C-1 zoning expressly includes an Acute Care Hospital. Let's handle that last issue first. Lakeway's C-1 zoning, while not prohibiting such a facility, does not specifically reference Acute Care Hospitals.

The letter seems to imply that the Lakeway City Council approved a General Development Plan for an "acute care hospital". That was actually my first Council Meeting as a Councilmember. I remember the discussion as being one that discussed a long term care facility. A document in our files from Abbe Engineering Co., the developer's engineer, describes the Lakeway Transitional Medical Center as "a 46-bed long-term acute care hospital"

Let's first be specific as to what exists in Lakeway today. Today there is an unfinished building that has been under construction for over two years. I do not believe that the incomplete facility behind the Post Office currently qualifies as a provider of acute care service to this community and at the current pace of construction; I don't see how it can be "open in the fall". This is especially true if extensive modifications have to be made. If modifications are planned they would need to be discussed with the City.

This construction site is active but the pace of work is slow relative to other ongoing construction projects. Please be aware that the records of the City of Lakeway have shown and continue to show this unfinished building is intended to be a long term acute care hospital. There has not been any official or unofficial communication to the City of Lakeway by any representative of the Lakeway Transitional Medical Center that the business plan for this building has substantially changed.

In fact, just the opposite is true. Roughly a month ago, City staff contacted the developer to ask about the slow pace of construction and to determine the developer's current expectations. The developer specifically told our staff that there were no changes in the original plans.

The City Council of the City of Lakeway fully supports the Lakeway Regional Medical Center and I continue to get very positive comments from citizens in Lakeway regarding the progress the Lakeway Regional Medical Center is making at the construction site. The site is certainly a beehive of activity!


Dave DeOme

Mayor – City of Lakeway, Texas

CONFIDENTIAL                                                                                    SDP0008217